Seth W. Wiener, California State Bar No. 203747
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Telephone: (925) 487-5607
Email: seth@sethwienerlaw.com

W. Cook Alciati (*pro hac vice* to be filed)
Gardella Grace P.A.
80 M Street SE, 1ˢᵗ Floor
Washington D.C., 20003
Telephone: (703) 721-8379
Email: calciati@gardellagrace.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARED.COM<br><br>Plaintiff,<br><br>vs.<br><br>META PLATFORMS, INC.<br><br>Defendant. | Case No. 3:22-cv-2366<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shared.com ("Shared") alleges as follows against Defendant Meta Platforms, Inc. f/k/a Facebook, Inc. ("Facebook").

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and Plaintiff is a citizen of a state different from Defendant.

2.      This Court has personal jurisdiction over Defendant at least because Facebook is headquartered in California and conducts business in the state of California.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

4.      Venue is also proper because Facebook's Terms of Service require that claims brought by a business located outside of the United States be resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County…." *See* Ex. 1, 2022 Commercial Terms.[1]

5.      As a Canadian company with its place of business in Ontario, Shared's claims against Facebook are not subject to arbitration.

## PARTIES

6.      Plaintiff Shared is a Partnership, formed in Ontario, and its principal place of business is 31C Cresthaven Drive, Nepean, Ontario, Canada, K2G 6T8.  Shared's partners are all residents of Canada.

7.      Defendant Facebook, Inc. is incorporated in Delaware, and its principal place of business is 1601 Willow Road, Menlo Park, CA 94025.

---

[1] Ex. 1 represents Facebook's current commercial terms.  Since 2018, Facebook's commercial terms have required businesses located outside of the United States to bring their claims in this Court.  *See* Ex. 2, 2018 Commercial Terms.

**FACTUAL ALLEGATIONS**

8.     Shared began its business relationship with Facebook in 2008 when it began advertising through Facebook's self-serve advertising product.

9.     Shared is a content publisher that creates and publishes original, timely, and entertaining content.  In addition to the Shared.com domain, Shared operated on Facebook with at least the following pages:  Shared, Shared Food, Savvy, Shared Vintage, and Shared Animals (the "Shared Pages").

10.     Shared was founded, by James Walker and is owned by James Walker and Jordan Nabigon.  In 2017, Mr. Nabigon was selected for inclusion in QuantumShift, which is a program for Canada's Top Entrepreneurs put on by the Ivey School of Business and KPMG. QuantumShift is sponsored by The Globe and Mail and TD Bank and selects 50 individuals each year.

11.     At its peak, Shared employed eighty individuals between its offices in Ottawa and Toronto within the province of Ontario, Canada.

12.     Between 2006-2020, Shared spent approximately $53,000,000 on Facebook advertising.[2]  Through that ad spend, and its dedicated efforts over many years, Shared was able to amass approximately 25,000,000 followers across the Shared Pages.

13.     In view of its success, Shared received an offer of purchase in the amount of $35,000,000 in 2017, which represented a valuation of seven times EBIDTA.

14.     Shared was involved with Facebook advertising in two ways: 1) Shared availed itself of Facebook's self-serve advertising product; and 2) Shared participated in the Instant Articles monetization feature of the Audience Network.

15.     Facebook's self-serve advertising service allows customers like Shared to purchase ads, which Facebook will place throughout its "news feed".  Shared provided Facebook with a budget, and Facebook charged Shared based on clicks and/or impressions.  Among other ads, Shared would purchase self-serve ads asking Facebook users to like the Shared Pages, which

---

[2] All dollar figures referred to herein refer to Canadian Dollars unless otherwise specified.

in turn would promote Shared's content within Facebook's news feed.  This would drive traffic to Shared's website allowing Shared to sell advertising to other parties.  Shared's use of the Facebook self-serve advertising product was governed by the Self-Serve Ad Terms (Ex. 3),[3] Advertising Policies (Ex. 4), and Commercial Terms (Exs. 1 and 2).

16.     Facebook's Instant Articles monetization feature of the Audience Network operates by embedding Shared content in the news feed on Facebook.  The user clicks on the content, but rather than being directed to Shared's website outside of the Facebook ecosystem, the article appears within Facebook.  Facebook would place ads from businesses other than Shared within Shared's article.  Facebook would then pay Shared a portion of Facebook's advertising revenue generated from placing ads within Shared's content.  Instant Articles is available to eligible Facebook publishers, but the monetization feature is specific to the Facebook Audience Network.

17.     In order to be successful in using the Instant Articles feature, Shared needed interesting content, which would drive interactions with the content and increase the distribution of the content within a user's news feed (reach).  The more the content is distributed in users' news feeds, the more users would navigate to Shared's content, and the more incentive Facebook would have to place ads within Shared's Instant Articles, which would drive revenues for Shared.  Consequently, Shared invested heavily in content creation.  Shared did so based on, among other factors, its long history with Facebook and in reliance on Facebook's Audience Network Terms (the "FAN Terms"), which in part governed Shared's ability to monetize the Instant Articles.

18.     The FAN Terms contractually required Facebook to use "good faith efforts to provide" Shared with notice if Facebook discontinued Shared's use of the Instant Articles

---

[3] Ex. 3 is a copy of the Facebook's Self-Serve Ad Terms as they existed in October 2020 when Facebook suspended Shared's advertising account as retrieved from the "Internet Archive," referred to as the "Way Back Machine."

monetization feature. Ex. 5.[4]  These notice provisions were important to Shared at least because if Shared had notice that it would lose the monetization feature it could have shifted its content creation strategy away from creating content tailored to Facebook's Instant Articles service. Shared also would have used the notice to shift its online marketing strategy by, for example, focusing on online advertising through Google Ads.

19.     In addition, the FAN Terms required Facebook to pay Shared the money Shared earned from the Instant Articles monetization feature "approximately 21 days following the end of the calendar month in which the transaction occurred . . . ."  Ex. 5.

20.     Based on its success in using Facebook advertising, Shared invested heavily in a custom built content management system ("CMS") that fully integrated with Facebook publishing and automatically published all articles on Shared.com to be compatible with the Instant Articles monetization feature.  Shared hired a Chief Technology Officer to oversee the development and implementation of the CMS.  That individual was recommended by a top executive at Facebook Canada, and he was brought in specifically to grow Shared's already substantial success operating with the Facebook advertising ecosystem.  Shared's investment in the CMS was in the seven-figure range.  Facebook in fact suggested that Shared open an office in Toronto in the same building as Facebook.

21.     Between 2016 and 2020, Shared spent approximately $3,500,000 developing systems and tools to succeed within the Facebook advertising ecosystem, on top of the millions it spent directly on Facebook advertisements.  Shared spent that money in reliance on Facebook living up to its contract and with the understanding that Facebook would act in good faith as a reasonable business partner.

22.     On April 24, 2018, Shared first lost ad monetization within the Instant Articles monetization feature of the Facebook Audience network, preventing Shared from generating revenue through that feature.  Despite the contractual requirement that Facebook use "good faith

[4] Ex. 5 is a copy of the FAN Terms as they existed in May 2020.  Upon information and belief, the material provisions of the terms remained the same from 2018 through 2020 when Facebook suspended Shared's advertising account.

efforts" to provide Shared with notice if it discontinued Shared's use of the Instant Articles monetization feature, Facebook provided no advance notice.

23.     The surreptitious termination of Shared's ability to use the Instant Articles monetization feature by Facebook also delayed a payment that Facebook was required to make in the amount of $90,885.63.  Facebook's failure to pay this amount on time was a further breach of the contract between Shared and Facebook.  While Facebook ultimately did make the payment, without its timely receipt and due to Facebook's ongoing breaches of its contract with Shared, Shared had no choice but to lay off 18 people on July 13, 2018.

24.     When Facebook terminated Shared's ability to use the Instant Articles monetization feature, Shared's content would still open within Facebook (as opposed to the user being directed to Shared's own page).  Shared's content had been specifically created to allow Facebook to place ads within the content.  When Facebook did not do so, Shared lost the opportunity to place ads within the content that it would have had if the content were hosted on Shared's own site.  This situation compounded the financial harm suffered by Shared.

25.     On August 10, 2018, a Facebook representative informed Shared that Facebook's development team had found a "bug" that allegedly caused Shared to lose its ability to use the Instant Articles monetization feature of the Facebook Audience Network.

26.     On August 18, 2018, Facebook restored Shared's ability to use the Instant Articles monetization feature of Facebook's Audience Network.  During the time period between April 24, 2018, and August 18, 2018, Shared continued to create and distribute content, but without the contracted for ability to monetize that content through the ad monetization feature of the Instant Articles product.

27.     With Shared's access to the monetization feature restored, Facebook made the $90,885.63 payment on September 19, 2018.

28.     On September 20, 2018, Shared again lost its ability to use the Instant Articles monetization feature, and again Facebook breached the contract by failing to provide advanced notice to Shared.

29.     On October 2, 2018, Shared's ability to use the Instant Articles monetization feature was again restored without explanation, leading Shared to inquire with its Facebook representative as to whether it lost its ability to use Instant Articles monetization due to another "bug."

30.     On October 10, 2018, Shared heard from its Facebook representative, who assured Shared that there would be no further issues with Shared's use of the Instant Articles monetization feature while at the same time indicating that the representative would no longer be available to assist Shared in working with Facebook.

31.     Each time Shared lost its ability to use the Instant Articles monetization feature of the Facebook Audience Network, it suffered a significant revenue loss.  On November 12, 2018, Shared was forced to lay off an additional 10 people due to its latest Facebook-caused revenue loss.

32.     On November 29, 2018, Shared again lost its ability to use Instant Articles monetization, and once again Facebook failed to provide Shared with advanced notice.

33.     Facebook never restored Shared's ability to use Instant Articles monetization, leading Shared to struggle to point of insolvency.

34.     By June 21, 2019, Shared was forced to give notice to 8 of its 10 remaining employees that they would be laid off in August 2019.

35.     Then on October 26, 2020, without any notice and just as Shared was ready to turn a profit with a new business model, Facebook unpublished the Shared Pages, suspended Shared's ability to advertise, disabled Mr. Nabigon's personal profile, and suspended the personal ad accounts of other Shared personnel.

36.     When Facebook unpublished the Shared Pages, it effectively gave Shared a death sentence within the Facebook ecosystem.  Shared lost its property right in its 25,000,000 million followers that it had earned through its good faith investment in Facebook in reliance on Facebook's terms and conditions that governed the contract between Shared and Facebook.

37.     Facebook's repeated failure to provide Shared with any notice that it would discontinue Shared's use of Instant Articles monetization was not the only breach of contract

committed by Facebook during Shared's business relationship with Facebook.  Facebook breached its contract with Shared by arbitrarily rejecting ads Shared had purchased through Facebook's self-serve advertising platform without providing the explanation of why they had been rejected and how the ads could be made compliant with Facebook's rules.

38.   Under its contract with Shared (and its other advertising customers), Facebook, was contractually required to explain the basis for its decision to reject an ad as allegedly not complying with its Advertising Policies along with an explanation sufficient for Shared to bring the allegedly non-compliant ad into compliance.  Until July 2021, Facebook's advertising contract provided:  "If your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one."  Ex. 4 at 2.

39.   Facebook changed its contract removing its express obligation to provide details that would allow an advertiser to edit an allegedly non-compliant ad to bring it into compliance.  Rather than begin complying with its own contract and treating its customers fairly, Facebook attempted to contract out of its obligation to deal with its customers fairly.

40.   Over the course of its relationship with Facebook, Shared had numerous ads arbitrarily and incorrectly rejected without explanation.  Rather than provide Shared with the contractually mandated explanation of the reasons for the rejections with sufficient detail to allow Shared to bring the allegedly non-compliant ads into compliance, Facebook provided notices that were substantially similar to the following:



41.   Shared's significant investment in Facebook created significant value for Shared.  That value was best encapsulated by the 25,000,000 followers Shared had amassed.  Through its

extensive efforts and significant investment, Shared had developed an intangible property interest in its collection of followers, to whom it could publish new content and whose interest in Shared's content provided an invaluable source for advertising that Shared could monetize.

42.     Despite the significant investment Shared made into Facebook, Facebook has terminated Shared's ability to use Facebook, cratering the business and the $35,000,000 valuation it once enjoyed.  Of the eighty employees Shared had, only three remain.  Shared's plight has been covered by the media, including *Business Insider*.  Ex. 6.

43.     Within the Facebook ecosystem, a company like Shared's working capital is the amount of followers and likes it has.  The more likes and followers a company like Shared has, the more likely it is that Facebook will promote that company's content within a user's news feed.  The more that company's content appears in a user's news feed, the more likely it is that the user will interact with the content.  The more the user interacts with the content, the more opportunities there are for that company to generate revenue within the Facebook ecosystem. When Facebook suspends an account, such as Shared's, it halts momentum and user interaction. When Facebook takes the step—often arbitrarily—to permanently disable an account, the account owner is stripped of its effective capital in the form of followers and likes.  In the case of Shared, Facebook cut off the company from its approximately 25,000,000 followers, converting Shared's intangible property right and greatly harming the company.

44.     Facebook's breaches of contract, its misrepresentations, its unfair business practices, and its conversion of Shared's intangible property right in its collection of more than 25,000,000 followers have harmed Shared and left it with no choice but to pursue legal action against its once long-standing business partner, Facebook.

**FIRST CAUSE OF ACTION**

**Conversion**

45.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-44 as if fully set forth herein.

46.     Shared owned an intangible property right in its collection of 25,000,000 online followers that it had grown, developed, and earned through its extensive investment in Facebook advertising and online publishing over many years.

47.     On October 26, 2020, Facebook unpublished all of the Shared Pages within Facebook causing Shared to lose its ability to use its property right in the 25,000,000 followers it had amassed.

48.     Facebook's knowing and deliberate decision and action in unpublishing the Shared Pages substantially interfered with Shared's intangible property right by preventing Shared from accessing the collection of 25,000,000 followers it had amassed.  For example, Shared could no longer distribute content to its 25,000,000 followers, causing Shared to lose millions of dollars in advertising revenue.

49.     Shared did not consent to Facebook's interference with Shared's intangible property right.

50.     Facebook's conduct in unpublishing Shared's pages was a substantial factor in the harm suffered by Shared.

51.     Without access to its collection of 25,000,000 followers, Shared has been harmed in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Violations of California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq.*

52.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-44 as if fully set forth herein.

53.     Facebook violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, by engaging in fraudulent business acts or practices, engaging in unfair business acts or practices, engaging in acts prohibited by §§ 17500 through 17577.5, and disseminating unfair, deceptive, untrue, or misleading advertising as alleged previously and as further specified below.

54.     Until July 2021, Facebook's Advertising Policies advertised to potential consumers of the advertising services that Facebook will provide an explanation sufficient for the user to create a compliant ad during the ad review process.  Facebook's advertising in that regard was false.

55.     Facebook's false advertising was designed to induce the public, including Plaintiff, to purchase advertising services from Facebook.  Facebook's practices deceived the public into believing that when the public purchased advertising services from Facebook, the public would receive instruction as to how to bring an allegedly noncompliant ad into compliance with Facebook's policies.

56.     Facebook's deliberate decision to withhold the promised explanations during the ad review process is unscrupulous, and substantially injurious to business advertising purchasers, and thus constitutes an unfair practice under the UCL.

57.     Facebook's practice was also contrary to legislatively declared public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), and California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200). The harm these practices caused to Plaintiff and the other businesses advertising on Facebook outweigh their utility, if any.

58.     Prior to deciding to advertise and/or continue advertising on Facebook, Plaintiff read and reasonably relied upon the Advertising Policies, including specifically the provisions explaining that when an ad is rejected, Facebook would provide an explanation sufficient to enable the user to create a compliant ad.  Plaintiff understood that the Advertising Policies constituted an affirmative representation and contractual commitment by Facebook to provide such explanations. Plaintiff understood that the Advertising Policies provided the terms under which the advertising services would be provided by Facebook.

59.     Facebook's failure to provide the promised explanations during the ad review process is unscrupulous and gave it an unfair competitive advantage, as it allowed Facebook to provide advertising services at a lower cost and, during the ad sales process, made those

advertising services appear to be more valuable than they were.  Facebook could have devoted appropriate resources to supply the promised explanations but deliberately chose not to.  Instead, Facebook chose to maximize its profits, which grew to $29.1 billion in 2020.

60.     Plaintiff has standing to bring these claims under the UCL because it was injured and lost money or property, including but not limited to money paid toward Facebook advertisements, as a result of Facebook's fraudulent and unfair business practices.  Among other things, Plaintiff would not have bought as much in advertising services if Facebook had disclosed that it would not provide explanations during the ad review process and that ad campaigns or ad privileges could be revoked or suspended at any time without explanation.  If Facebook had disclosed this, Plaintiff would have paid a lower price for the advertising services it did purchase and/or would have purchased fewer advertisements.

61.     Due to Facebook's violation of the UCL, Plaintiff failed to receive the benefit of the contract, including the bargained-for benefit in exchange for their investments of months or years of time and resources building online Facebook presences, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers. Plaintiff paid Facebook substantial sums of money and devoted substantial time building online Facebook presence, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers.  Plaintiff would not have done so or would have done so to a much lesser extent, but for Facebook's misrepresentations.

### THIRD CAUSE OF ACTION

### Breach of Contract

62.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-44 as if fully set forth herein.

63.     Facebook breached its contract with Shared in at least three separate ways.

64.     First, Facebook breached its contract with Shared by failing to use good faith efforts to provide Shared with advance notice if Facebook disabled Shared's ability to use the ad monetization feature of Facebook's Instant Articles monetization feature.

65.     The FAN Terms required Facebook to use "good faith efforts to provide" Shared with advance notice if Facebook discontinued Shared's use of Instant Articles monetization.

66.     On April 24, 2018, Shared first lost ad monetization within the Instant Articles feature of the Facebook Audience Network.  When that happened, Shared was no longer able to generate revenue through the Instant Articles feature.  Facebook did not provide Shared with any notice that it would be discontinuing Shared's use of Instant Articles monetization.  Facebook did not restore the monetization feature until September 2018.  Thereafter Facebook disabled ad monetization on at least two separate occasions—each time without any advance notice to Shared.

67.     Second, Facebook breached its contract with Shared when Facebook failed to comply with its own self-service advertising policies in place at the relevant time.

68.     Facebook was obligated to provide businesses advertising on Facebook an explanation of why an ad was being rejected or advertising privileges were being suspended or revoked.  For example, the Advertising Policies provided that "[i]f your ad doesn't get approved, we'll send you an email with details that explain why" and that, using that information, the ad customer will be able to create a compliant ad.  Ex. 4 at 2.

69.     Facebook breached its contractual obligation to the Plaintiff, by rejecting ads without the promised explanation with information that would allow Shared to address a purported deficiency in an allegedly non-compliant ad.

70.     Facebook could have devoted appropriate resources (including human employees or contractors) to help supply the promised explanations but deliberately chose not to.  Instead, Facebook chose to maximize its profits, which swelled to $29.1 billion in 2020.

71.     As a result, Plaintiff purchased advertising services they would not otherwise have purchased and failed to receive the benefit of their bargain.

72.     Third, Facebook failed to make at least one payment to Shared in connection with the Instant Articles monetization feature on the contractually required payment schedule.

73.     The FAN Terms required Facebook to pay Shared the money Shared earned from the Instant Articles monetization feature "approximately 21 days following the end of the calendar month in which the transaction occurred . . . ."

74.     In one such situation, Shared was owed $90,885.63.  After Facebook terminated Shared's use of the Instant Articles monetization feature, Facebook failed to timely make the payment, leaving Shared with no choice but to lay off 18 people on July 13, 2018.

75.     Shared has been damaged by Facebook's breaches of contract in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

76.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-44 as if fully set forth herein.

77.     Plaintiff met all or substantially all of its contractual obligations, including submitting its advertising for Facebook's approval and paying for Facebook's advertising services.

78.     Facebook's FAN Terms required Facebook to use "good faith efforts to provide" notice if it disabled the ad monetization feature of the Instant Articles monetization product. Reasonably interpreted, such notice is advance notice.  But to the extent Facebook purports to read the contract as permitting after-the-fact notice, such a reading would violate the implied covenant of good faith and fair dealing operates to require that notice to have been advance notice.

79.     Implicit in the FAN Terms' notice provision is a duty for Facebook to treat its customers fairly by providing prior notice and opportunity to cure before removing Shared from the Facebook ecosystem in which Shared invested so substantially to Facebook's pecuniary benefit.

80.     Under California law, Facebook was required to perform its contractual obligations in good faith and to avoid any acts or material omissions which unfairly interfere with the right of any other party to receive the benefits of the contract.

81.     Had Facebook met its duty of good faith and fair dealing, it further would have provided Shared with a reasonable opportunity to remediate any perceived problems and thereby avoid suspension or revocation of its accounts.

82.     Due to Facebook's breach of its duty of good faith and fair dealing, Shared failed to receive the benefit of its contract with Facebook, including the bargained-for benefit in exchange for their investments of months or years of time and resources building an online Facebook presence, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers.

**FIFTH CAUSE OF ACTION**

**Intentional Misrepresentation**

**(Cal. Civ. Code §1710(1))**

83.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-44 as if fully set forth herein.

84.     Facebook intentionally misrepresented at least two key items during the course of its business relationship with Shared.

85.     First, Facebook intentionally misrepresented that it would use good faith efforts to provide Shared with notice if it suspended Shared's ability to use the ad monetization feature of the Instant Articles monetization service.

86.     The FAN Terms included the following representation:  "Publisher will participate in the Audience Network Service during the Term in accordance with these Audience Network Terms. Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and *FB will use good faith efforts to provide Publisher with notice of the same*[.]"  Ex. 5 at 1 (emphasis added).  By including this in the FAN terms, Facebook represented to Shared that it was true.

87.     Upon information and belief, Facebook knew that representation was false when Facebook made it.  At the very least, Facebook made the representation recklessly and without regard for its truth.

88.     At least because Facebook included the provision in the FAN terms, it intended that Shared would rely on it.

89.     Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of the Instant Articles monetization feature, which use generated profits for Facebook.  For example, Shared invested in content creators with the understanding that if Facebook would discontinue Shared's use of the Instant Articles monetization feature, Facebook would provide Shared with notice of the same.

90.     Shared was harmed by Facebook's intentional misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.  Had Shared received timely notice from Facebook that it would discontinue its access to the ad monetization feature, Shared could have, for example, shifted its content strategy away from content specifically designed to draw attention within the Facebook ecosystem.

91.     Second, Facebook falsely represented that during the ad review process, it would provide an explanation of the policy violation to enable the advertiser to create a compliant ad.

92.     Facebook's self-serve advertising policies included the following representation up until July 2021: "If your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one."  Ex. 4. By including that representation in its advertising policies, Facebook represented to Shared that it was true.

93.     Facebook knew that representation was false when Facebook made it.  In the alternative Facebook made the representation recklessly and without regard for its truth.

94.     At least because Facebook included the provision in its self-serve advertising terms, it intended that Shared would rely on it.

95.     Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of Facebook's self serve advertising service.

96.     Shared was harmed by Facebook's intentional misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.

97.     Plaintiff seeks an award of compensatory damages, including specifically lost profits and punitive damages.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Cal. Civ. Code §1710(2))

98.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-44 as if fully set forth herein.[5]

99.     The FAN Terms included the following representation:  "Publisher will participate in the Audience Network Service during the Term in accordance with these Audience Network Terms. Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and *FB will use good faith efforts to provide Publisher with notice of the same*[.]"  Ex. 5 at 1 (emphasis added).  By including this in FAN terms, Facebook represented to Shared that it was true.

100.     Upon information and belief, even if Facebook honestly believed that representation was true, Facebook had no reasonable grounds for believing that it would actually treat its customers fairly and use good faith efforts to provide notice that it would discontinue access to the Audience Network service.

101.     At least because Facebook included the provision in the FAN terms, it intended that Shared would rely on it.

102.     Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of the Instant Articles monetization feature, which use generated profits for Facebook.  For example, Shared invested in content creators with the understanding that if Facebook would discontinue Shared's use of the Instant Articles monetization feature, Facebook would provide Shared with notice of the same.

---

[5] Shared pleads this sixth cause of action as an alternative to its fifth cause of action.

103.    Shared was harmed by Facebook's negligent misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.

104.    Facebook's self-serve advertising policies included the following representation up until July 2021: "If your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one."

105.    By including the representation set forth in the immediately preceding paragraph in its advertising policies, Facebook represented to Shared that it was true.

106.    Facebook falsely represented that during the ad review process, it would provide an explanation of the policy violation to enable the advertiser to create a compliant ad. Facebook also falsely represented at least through its conduct that it would provide advance notice of and explanation for any suspension or revocation of advertising privileges.

107.    Upon information and belief, even if Facebook honestly believed that representation was true, Facebook had no reasonable grounds for believing that it would invest the resources needed to allow Facebook to comply with the terms of its representation.

108.    At least because Facebook included the provision in its self-serve advertising terms, it intended that Shared would rely on it.

109.    Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of Facebook's self serve advertising service.

110.    Shared was harmed by Facebook's negligent misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.

111.    Plaintiff seeks an award of compensatory damages, including specifically lost profits and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in its favor:

A.      On Shared's First Cause of Action for Conversion:  damages in an amount to be proven at trial;

B.      On Shared's Second Cause of Action for violation of California's Unfair Competition law:  compensatory damages in an amount to be proven at trial;

C.      On Shared's Third Cause of Action for Breach of Contract:  compensatory damages in an amount to be proven at trial;

D.      On Shared's Fourth Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing:  compensatory damages in an amount to be proven at trial;

E.      On Shared's Fifth Cause of Action for Intentional Misrepresentation: compensatory damages, including specifically lost profits, in an amount to be proven at trial;

F.      On Shared's Sixth Cause of Action for Negligent Misrepresentation: compensatory damages in an amount to be proven at trial;

G.      Disgorgement of the ill-gotten gains derived by Facebook from its misconduct;

H.      Statutory damages as permitted by law;

I.      Punitive and exemplary damages;

J.      Pre-judgment interest at the maximum rate permitted by applicable law;

K.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

L.      Such other relief as this Court deems just and proper.

1

## JURY TRIAL DEMAND

2

Plaintiff hereby requests a jury trial for all issues so triable.

3

4   Dated:   April 15, 2022                    Respectfully submitted,

5

6

7

8                                             Seth W. Wiener, California State Bar No. 203747
                                              Law Offices of Seth W. Wiener
9                                             609 Karina Court
                                              San Ramon, CA 94582
10                                            Telephone: (925) 487-5607
                                              Email: seth@sethwienerlaw.com
11

12                                            W. Cook Alciati (*pro hac vice to be filed*)
                                              Gardella Grace P.A.
13                                            80 M Street SE, 1st Floor
                                              Washington D.C., 20003
14                                            Telephone: (703) 721-8379
                                              Email: calciati@gardellagrace.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

     

*The Facebook company is now Meta. We've updated our Terms of Use, Data Policy, and Cookies Policy to reflect the new name on January 4, 2022. While our company name has changed, we are continuing to offer the same products, including the Facebook app from Meta. Our Data Policy and Terms of Service remain in effect, and this name change does not affect how we use or share data.* *Learn more about Meta* *and our vision for the metaverse.*

These terms reflect our updated **European Data Transfer Addendum** incorporating new Standard Contractual Clauses effective September 27, 2021.

## Meta Commercial Terms ("Commercial Terms")

These Commercial Terms apply to access or use of the **Meta Products** (or "**Products**"), for a business or commercial purpose (except where we state that separate terms, and not these Commercial Terms, apply to such access or use of a Facebook Product). Business or commercial purposes include using ads, selling products, developing apps, managing a Page, managing a Group for business purposes, or using our measurement services regardless of the entity type.

You agree that you will ensure that any third party on whose behalf you access or use any Meta Product for any business or commercial purpose will abide by the applicable terms of use, including these Commercial Terms, the **Meta Terms of Service** ("**Terms**"), and any applicable supplemental terms, and you represent and warrant that you have the authority to bind that third party to such terms.

As more fully described below, if you reside in the United States or your business is located in the United States, these Commercial Terms require the resolution of most disputes between you and us by binding arbitration on an individual basis; class actions and jury trials are not permitted.

1. **Licenses:** As described in *"The permissions you give us"* section in our Terms, you grant us a license to content that is covered by intellectual property rights (like photos or videos) you share, post, or upload on or in connection with our Meta Products. For any access or use of the Meta Products, that license applies to content you or someone on your behalf (such as your agency that places an ad for you or your service provider that manages your Page content for you) makes available on or in connection with any Meta Product. You also will ensure that you own or have secured all rights necessary to grant the licenses and rights you (or someone on your behalf) grant to us under the Commercial Terms and any applicable supplemental terms, including permission to display, distribute and deliver your content within the Meta Products.

2. **Compliance with Law:** You represent and warrant that your access or use of the Meta Products for business or commercial purposes complies with all applicable laws, rules, and regulations. You further represent that you will restrict access to your content and apps in accordance with all applicable laws, rules, and regulations, including geo-filtering or age-gating access where required. In addition to and without limiting the requirements about who can use the Meta Products under our Terms, if you located in a country that is subject to embargo under the laws of the United States (or under similar laws applicable to you) you may not engage in commercial activities on the Meta Products unless authorized by applicable laws. If you are on the U.S. Treasury Department's list of Specially

 

on the Meta Products (such as advertising or payments). You also may not access or use the Meta Products if you are prohibited from receiving products, services, or software under applicable law.

3. <u>**Data Restrictions:**</u> You may not send us information prohibited by the supplemental terms or policies. In addition, you may not send to us, or use Meta Products to collect from people, information that: (i) you know or reasonably should know is from or about children under the age of 13; or (ii) includes health, financial, biometrics, or other categories of similarly sensitive information (including any information defined as sensitive under applicable law); except in cases where (a) the terms for that Meta Product specifically allow it or (b) you are sending financial information for the express purpose of effecting a financial transaction either with us or as enabled by a Meta Product.

4. <u>**Limits on Liability:**</u> In addition to and without limiting the scope of the *"Limits on liability"* section in our Terms, you agree that we are not responsible for the actions, services, content, or data of third parties and you release us, our directors, officers, employees, and agents from any claims and damages, known or unknown, arising out of or in any way connected with any claim you have against any such third parties.

   If you are a California resident, you agree to waive California Civil Code § 1542, which says:

   A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

   Our aggregate liability arising out of or relating to any access or use of the Meta Products, the Terms (for any access or use of the Meta Products for business or commercial purposes), or these Commercial Terms will not exceed the greater of one hundred dollars ($100) or the amount you have paid us in the past twelve months.

5. <u>**Disputes:**</u>

   a. <u>Third Party Claims:</u> If anyone brings a claim, cause of action, or dispute against us related to your services, actions, content or information on Facebook or other Meta Products or your use of any Meta Products, you agree to indemnify and hold us harmless from and against any damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to any such claim, cause of action, or dispute.

   b. <u>Commercial Claims:</u> Sections 5.c and 5.d below apply to any claim, cause of action, or dispute that arises out of or relates to any access or use of the Meta Products for business or commercial purposes ("**Commercial Claim**") between you and Meta.

   c. <u>U.S. Commercial Claims:</u> If you reside in the United States or your business is located in the United States:

       i. You agree to arbitrate Commercial Claims between you and Meta Platforms, Inc. This provision does not cover any commercial claims relating to violations of your or our

   

of your or our confidential information or trade secrets, or efforts to interfere with our Products or engage with our Products in unauthorized ways (for example, automated ways). If a Commercial Claim between you and Meta Platforms, Inc. is not subject to arbitration, you agree that the claim must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

ii. We and you agree that, by entering into this arbitration provision, all parties are waiving their respective rights to a trial by jury or to participate in a class or representative action. THE PARTIES AGREE THAT EACH MAY BRING COMMERCIAL CLAIMS AGAINST THE OTHER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. You may bring a Commercial Claim only on your own behalf and cannot seek relief that would affect other parties. If there is a final judicial determination that any particular Commercial Claim (or a request for particular relief) cannot be arbitrated according to the limitations of this Section 5.c, then only that Commercial Claim (or only that request for relief) may be brought in court. All other Commercial Claims (or requests for relief) will remain subject to this Section 5.c. The Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. All issues are for an arbitrator to decide, except that only a court may decide issues relating to the scope or enforceability of this arbitration provision or the interpretation of the prohibition of class and representative actions. If any party intends to seek arbitration of a dispute, that party must provide the other party with notice in writing. This notice of dispute to us must be sent to the following address: Meta Platforms, Inc. 1601 Willow Rd. Menlo Park, CA 94025. The arbitration will be governed by the AAA's Commercial Arbitration Rules ("**AAA Rules**"), as modified by these Commercial Terms, and will be administered by the AAA. If the AAA is unavailable, the parties will agree to another arbitration provider or the court will appoint a substitute. The arbitrator will not be bound by rulings in other arbitrations in which you are not a party. To the fullest extent permitted by applicable law, any evidentiary submissions made in arbitration will be maintained as confidential in the absence of good cause for its disclosure. The arbitrator's award will be maintained as confidential only to the extent necessary to protect either party's trade secrets or proprietary business information or to comply with a legal requirement mandating confidentiality. Each party will be responsible for paying any AAA filing, administrative and arbitrator fees in accordance with AAA Rules, except that we will pay for your filing, administrative, and arbitrator fees if your Commercial Claim for damages does not exceed $75,000 and is non-frivolous (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you do not wish to be bound by this provision (including its waiver of class and representative claims), you must notify us as set forth below within 30 days of the first acceptance date of any version of these Commercial Terms containing an arbitration provision. Your notice to us under this Section 5.c must be submitted to the address here: Meta Platforms, Inc. 1601 Willow Rd. Menlo Park, CA 94025. All Commercial Claims between us, whether subject to arbitration or not, will be governed by California law, excluding California's conflict of laws rules, except to the extent that California law is contrary to or preempted by federal law. If a Commercial Claim between you and us is subject to arbitration, you agree that the claim must be resolved exclusively in the U.S.

 

 

County, and that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

    d. <u>Commercial Claims outside the United States:</u> If you reside outside the United States or your business is located outside the United States, you agree that:

        i. Any Commercial Claim between you and Meta Platforms, Inc. must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Commercial Terms and any such claim, without regard to conflict of law provisions.

        ii. Any Commercial Claim between you and Meta Platforms Ireland Limited must be resolved exclusively in the courts of the Republic of Ireland, that you submit to the personal jurisdiction of the Republic of Ireland for the purpose of litigating any such claim, and the laws of the Republic of Ireland will govern these Commercial Terms and any such claim, without regard to conflict of law provisions.

        iii. Notwithstanding (i) and (ii) above, any Commercial Claim between you and both Meta Platforms, Inc. and Meta Platforms Ireland Limited must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Commercial Terms and any such claim, without regard to conflict of law provisions.

        iv. Without prejudice to the foregoing, you agree that, in our sole discretion, we may also bring any claim we have against you related to efforts to abuse, interfere, or engage with our Products in unauthorized ways in the country in which you reside that has jurisdiction over the claim.

    e. <u>Severability:</u> If any provision of this Section 5 is found unenforceable, that provision will be severed and the balance of this Section 5 will remain in full force and effect.

6. <u>**Updates:**</u> We may need to update these Commercial Terms from time to time, including to accurately reflect the access or uses of our Products for business or commercial purposes, and so we encourage you to check them regularly for any updates. By continuing any access or use of any Meta Products for business or commercial purposes after any notice of an update to these Commercial Terms, you agree to be bound by them. Any updates to Section 5 of these Commercial Terms will apply only to disputes that arise after notice of the update takes place. If you do not agree to the updated terms, please stop all access or use of our Products for business or commercial purposes.

7. <u>**Conflicts and Supplemental Terms:**</u> If there is a conflict between these Commercial Terms and t' Terms, these Commercial Terms will govern with respect to your access and use of the Meta Pro for business or commercial purposes to the extent of the conflict. Supplemental terms and policies



with the Commercial Terms, the supplemental terms will govern with respect to your use of those Meta Products to the extent of the conflict.

    a. If any portion of these Commercial Terms are found to be unenforceable, then (except as otherwise provided) that portion will be severed and the remaining portion will remain in full force and effect.

    b. If we fail to enforce any of these Commercial Terms, it will not be considered a waiver.

    c. Except as permitted in Section 6, any amendment to or waiver of these Commercial Terms must be made in writing and signed by us.

    d. You will not transfer any of your rights or obligations under these Commercial Terms to anyone else without our consent.

    e. These Commercial Terms do not confer any third party beneficiary rights.

    f. We offer tools to provide transparency and controls to our users about the Facebook experience, including information to show them why they are being shown specific content or provide feedback about content, and controls to block content or stop seeing certain types of content (such as by removing themselves from interests used for advertising). You agree that information about you and your use of Meta Products for commercial or business purposes may be included in these tools. For clarity, our license to content extends to the display of content in conjunction with providing these tools.

    g. You consent that we may disclose your advertising content and Facebook Page posts ("**Commercial Content**"), and all information associated with such Commercial Content, including information associated with the delivery of that Commercial Content, in response to valid legal process related to an electoral matter or to a governmental entity or body if Meta believes that disclosure would assist in a lawful investigation.

    h. Please note that our retention policies for Commercial Content may differ from those set forth in the Terms. We retain Commercial Content as necessary to provide our services to users, for internal record keeping, and for product improvement and safety purposes.

    i. All of our rights and obligations under these Commercial Terms are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.

    j. Nothing in these Commercial Terms or any applicable supplemental terms will prevent us from complying with the law.

    k. We reserve all rights not expressly granted to you.

Note: For purposes of these Commercial Terms, references in existing terms or agreements to (i) "the Statement of Rights and Responsibilities," "Statement," or "SRR," will now mean the Meta Terms or Terms

 

Privacy · Terms · Advertising · Ad Choices  · Cookies · More · Meta © 2022

Effective Date: January 4, 2022



# EXHIBIT 2

# EXHIBIT 2

Sign Up

Join or Log Into Facebook

**Facebook Commercial Terms**

The Facebook Terms and these terms (the "**Facebook Commercial Terms**" or "**Commercial Terms**") apply to access or use of the Facebook Products (or Products), including Facebook Business Tools, for any business or commercial purpose (except where we state that separate terms (and not these) apply to such access or use of a Facebook Product). This includes, but is not limited to, buying ads, selling products, developing apps, managing a group or Page for a business, or using our measurement services.

You agree that you will ensure that any third party on whose behalf you access or use any Facebook Product for any business or commercial purpose (except, again, where we state that separate terms (and not these) apply to such access or use) is bound by the Terms, these Commercial Terms and any applicable supplemental terms, and you represent and warrant that you have the authority to bind that third party to such terms.

These Commercial Terms require the resolution of most disputes between you and us by binding arbitration on an individual basis; class actions and jury trials are not permitted.

Note: we have updated the Statement of Rights and Responsibilities, including changing its name to the Facebook Terms of Service. For purposes of these Commercial Terms, references in existing terms or agreements to (i) "the Statement of Rights and Responsibilities," "Statement," or "SRR," shall now mean the Facebook Terms or Terms and (ii) "Facebook" (when used to refer to our products and services) or "Facebook Services" or "Services" shall now mean Facebook Products.

1. **Licenses:** As described in *"The permissions you give us"* section in our Terms, you grant us a license to content that is covered by intellectual property rights (like photos or videos) you share, post, or upload on or in connection with our Products. For any access or use of the Facebook Products for business or commercial purposes, that license applies to content you or someone on your behalf (such as your agency that places an ad for you or your service provider that manages your Page content for you) makes available on or in connection with any Facebook Product.

   You also will ensure that you own or have secured all rights necessary to grant the licenses and rights you (or someone on your behalf) grant to us under the Commercial Terms and any applicable supplemental terms, including permission to display, distribute and deliver your content within Facebook Products.

2. **Compliance with law:** You represent and warrant that your access or use of Facebook Products for business or commercial purposes complies with all applicable laws, rules, and regulations. You further represent that you will restrict access to your content and apps in accordance with all applicable laws, rules, and regulations, including geo-filtering or age-gating access where required.

   In addition to and without limiting the requirements about who can use the Facebook Products under our Terms, if you are located in a country that is subject to embargo under the laws of the United States (or under similar laws applicable to you) you may not engage in commercial activities on Facebook Products unless authorized by applicable laws. If you are on the U.S. Treasury Department's list of Specially Designated Nationals (or an equivalent lists), you may not engage in commercial or business activities on the Facebook Products (such as advertising or payments). You also may not access or use the Facebook Products if you are prohibited from receiving products, services, or software under applicable law.

3. **Limits on liability:** In addition to and without limiting the scope of the *"Limits on liability"* section in our Terms, you agree that we are not responsible for the actions, services, content, or data of third parties and you release us, our directors, officers, employees, and agents from any claims and damages, known or unknown, arising out of or in any way connected with any claim you have against any such third parties.

   If you are a California resident, you agree to waive California Civil Code § 1542, which says:

   A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

   Our aggregate liability arising out of or relating to any access or use of the Facebook Products for business or commercial purposes, the Terms (for any access or use of the Facebook Products for business or commercial purposes), or these Commercial Terms shall not exceed the greater of one hundred dollars ($100) or the amount you have paid us in the past twelve months.

4. **Disputes:**
   a. Indemnification. If anyone brings a claim, cause of action, or dispute against us related to your services, actions, content or information on Facebook or other Facebook Products or your use of any Facebook Products, you agree to indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to any such claim, cause of action, or dispute.

   b. Dispute resolution

   If you reside outside the US or your business is located outside the US: You agree that any claim, cause of action, or dispute you have against us that arises out of or relates to any access or use of the Facebook Products for business or commercial purposes must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Commercial Terms and any such claim, without regard to conflict of law provisions.

   If you reside in the US or your business is located in the US: You and we agree to arbitrate any claim, cause of action, or dispute between you and us that arises out of or relates to any access or use of the Facebook Products for business or commercial purposes ("commercial claim"). This provision does not cover any commercial claims relating to violations of your or our intellectual property rights, including, but not limited to, copyright infringement, patent infringement, trademark infringement, violations of the Brand Usage Guidelines, violations of your or our confidential information or trade secrets, or efforts to interfere with our Products or engage with our Products in unauthorized ways (for example, automated ways).

   We and you agree that, by entering into this arbitration provision all parties are waiving their respective rights to a trial by jury or to participate in a class or representative action. THE PARTIES AGREE THAT EACH MAY BRING COMMERCIAL CLAIMS AGAINST THE OTHER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. You may bring a commercial claim only on your own behalf and cannot seek relief that would affect other parties. If there is a final judicial determination that any particular commercial claim (or a request for particular relief) cannot be arbitrated in accordance with this paragraph's limiations, then only that commercial claim (or only that request for relief) may be brought in court. All other commercial claims (or requests for relief) remain subject to this paragraph.

The Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. All issues are for an arbitrator to decide, except that only a court may decide issues relating to the scope or enforceability of this arbitration provision or the interpretation of the prohibition of class and representative actions.

If any party intends to seek arbitration of a dispute, that party must provide the other party with notice in writing. This notice of dispute to us must be sent to the following address:

Facebook, Inc.
1601 Willow Rd.
Menlo Park, CA 94025

The arbitration will be governed by the AAA's Commercial Arbitration Rules ("AAA Rules"), as modified by these Commercial Terms, and will be administered by the AAA. If the AAA is unavailable, the parties will agree to another arbitration provider or the court will appoint a substitute. The arbitrator will not be bound by rulings in other arbitrations in which you are not a party. To the fullest extent permitted by applicable law, any evidentiary submissions made in arbitration will be maintained as confidential in the absence of good cause for its disclosure. The arbitrator's award will be maintained as confidential only to the extent necessary to protect either party's trade secrets or proprietary business information or to comply with a legal requirement mandating confidentiality. Each party will be responsible for paying any AAA filing, administrative and arbitrator fees in accordance with AAA Rules, except that we will pay for your filing, administrative, and arbitrator fees if your commercial claim for damages does not exceed $75,000 and is non-frivolous (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)).

If you do not wish to be bound by this provision (including its waiver of class and representative claims), you must notify us as set forth below within 30 days of the first acceptance date of any version of these Commercial Terms containing an arbitration provision. Your notice to us under this subsection must be submitted to the address here:

Facebook, Inc.
1601 Willow Rd.
Menlo Park, CA 94025

All commercial claims between us, whether subject to arbitration or not, will be governed by California law, excluding California's conflict of laws rules, except to the extent that California law is contrary to or preempted by federal law.

If a commercial claim between you and us is not subject to arbitration, you agree that the claim must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

If any provision of this dispute resolution provision is found unenforceable, that provision will be severed and the balance of the dispute resolution provision will remain in full force and effect

5. **Updates:** We may need to update these Commercial Terms from time to time, including to accurately reflect the access or uses of our Products for business or commercial purposes, and so we encourage you check them regularly for any updates. By continuing any access or use of any Facebook Products for business or commercial purposes after any notice of an update to these Commercial Terms, you agree to be bound by them. Any updates to the Disputes section of these Commercial Terms will apply only to disputes that arise after notice of the update takes place. If you do not agree to the updated terms, please stop all access or use of our Products for business or commercial purposes.

6. **Conflicts and supplemental terms:** If there is a conflict between the Commercial Terms and the Facebook Terms, the Commercial Terms shall govern with respect to your access and use of the Facebook Products for business or commercial purposes to the extent of the conflict.

Supplemental terms and policies may also apply to your use of certain Products. To the extent those supplemental terms conflict with the Commercial Terms, the supplemental terms will govern with respect to your use of those Products to the extent of the conflict. For example:

- If you use Facebook Platform, you must agree to the Facebook Platform Policy. By "Platform" we mean a set of APIs, SDKs, plugins, code, specifications, documentation, technology, and services (such as content) that enable others, including application developers and website operators, to retrieve data from Facebook or any other Facebook Products or provide data to us.
- If you use our self-service advertising creation interfaces for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, the "Self-Serve Ad Interfaces"), you must agree to our Self-Serve Ad Terms.
- Your advertising placed on Facebook Company Products or our publisher network must comply with our Advertising Policies.
- If you use Facebook Business Tools, you agree to our Facebook Business Tools Terms
- If you administer a Page, Group or Event, you agree to our Pages, Groups and Events Policy.
- If you use any service Facebook makes available for merchants to display, facilitate the sale of, and/or sell products to users, you agree to our Facebook Commerce Product Merchant Agreement.
- If you accept payments for digital goods using the Facebook Payments service, you agree to our Developer Payment Terms.
- If you use Facebook's custom audiences feature (or target ads using any audience created from the custom audience feature), you agree to our Custom Audiences Terms.

As with our Commercial Terms, we may make changes to these supplemental terms. By continuing to access or use any Facebook Products subject to supplemental terms after notice of any update to the supplemental terms, you agree to be bound by them.

7. **Other**

- The Facebook Terms, these Commercial Terms, and other applicable supplemental terms make up the entire agreement between the parties regarding access or use of the Facebook Products for any business or commercial purpose, and supersede any prior agreements.
- If any portion of these Commercial Terms are found to be unenforceable, then (except as otherwise provided) that portion will be severed and the remaining portion will remain in full force and effect.
- If we fail to enforce any of these Commercial Terms, it will not be considered a waiver.
- Any amendment to or waiver of these Commercial Terms must be made in writing and signed by us.
- You will not transfer any of your rights or obligations under these Commercial Terms to anyone else without our consent.
- These Commercial Terms do not confer any third party beneficiary rights.
- You consent that Facebook may disclose your advertising content and Page posts ("commercial content"), and all information associated with such content your advertising, including information associated with the delivery of that content, in response to valid legal process related to an electoral matter or to a governmental entity or body if Facebook believes that disclosure would assist in a lawful investigation.
- All of our rights and obligations under these Commercial Terms are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.

- Nothing in these Commercial Terms shall prevent us from complying with the law.
- We reserve all rights not expressly granted to you.

Effective Date: May 25, 2018

English (US)   Español   Français (France)   中文(简体)   العربية   Português (Brasil)   Italiano   한국어   Deutsch   हिन्दी   日本語

Sign Up   Log In   Messenger   Facebook Lite   Mobile   Find Friends   People   Pages   Page Categories   Places   Games   Locations   Marketplace   Groups
Instagram   Local   About   Create Ad   Create Page   Developers   Careers   Privacy   Cookies   Ad Choices   Terms   Account Security   Login Help   Help

Facebook © 2018

# EXHIBIT 3

# EXHIBIT 3

Sign Up

Join or Log Into Facebook

## Self-Serve Ad Terms

The following terms ("**Self-Serve Advertising Terms**" or "**Self-Serve Ad Terms**") apply to your use of Facebook Products (such as the self-service advertising interfaces and APIs) for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, "**Self-Serve Ad Interfaces**") and any order you place through the Self-Serve Ad Interfaces ("**Order**").

You can target your desired audience by buying ads to be delivered on Facebook, Messenger, Instagram, our publisher network, or any place we serve ads.

1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we use best efforts to deliver the ads to the audience you specify or to achieve the outcome you select, though we cannot guarantee in every instance that your ad will reach its intended target or achieve the outcome you select.

2. Your ads must comply with all applicable laws, regulations, and guidelines, as well as our Advertising Policies. Failure to comply may result in a variety of consequences, including the cancellation of ads you have placed and termination of your account.

3. We may reject or remove any ad for any reason.

4. You will pay for your Orders in accordance with the following:
    a. You will comply with our Community Payments Terms to the extent applicable.

    b. You will pay all amounts specified in each Order you place, along with any applicable taxes. The amount you owe for each Order will be calculated based on our tracking mechanisms.

    c. By placing an Order, you authorize us to obtain your personal and/or business credit report from a credit bureau, either when you place an Order or at any time thereafter.

    d. You are responsible for maintaining the security of your advertising account, and you understand that you will be charged for any Orders placed on or through your advertising account.

    e. If you are making direct debit payments, you agree that we can charge you any amount that falls within the range you agreed to upon signup. We will notify you in advance if any charge will exceed the agreed-upon range.

    f. You can cancel an Order at any time, but your ads may run for 24 hours after you notify us, and you are still responsible for paying for all ads that run.

    g. The amounts we charge you may be subject to and include applicable taxes and levies, including without limitation withholding taxes. You are responsible for bearing and remitting any taxes that apply to your transactions. You will indemnify and hold us harmless from and against any claim arising out of your failure to do so.

    h. If your payment method fails or your account is past due, we may take additional steps to collect past due amounts. You will pay all expenses associated with such collection, including reasonable attorneys' fees. Past due amounts will accrue interest at 1% per month or the lawful maximum, whichever is less.

    i. We may allow you to purchase ads with an "Advertiser Balance," which is a pre-paid balance that can be used solely to purchase ads on Facebook. Advertiser Balances are only for business or commercial purposes. Advertiser Balances are non-refundable except where required by law. Facebook is not a bank and does not offer banking services; accordingly, Advertiser Balances do not earn interest, are not deposit obligations, and are not insured by the Federal Deposit Insurance Corporation, the Financial Services Compensation Scheme, or any other entity or insurance scheme, whether governmental or private.

    j. You will fall under one of two categories depending on your payment method: invoiced or non-invoiced client. Invoiced clients are those for whom Facebook sets a maximum spending limit and issues invoices on a periodic basis for payment in accordance with the applicable invoicing terms. Non-invoiced clients are those who must make payments at the time of purchase itself. In its sole discretion, Facebook may classify clients as invoiced clients based on factors such as ad spend and creditworthiness.

5. From time to time, we need to test improvements to our audiences and delivery systems, which could impact your advertising. Our testing is designed to improve the effectiveness of your advertising performance. We reserve the right to test when we believe it will be beneficial for advertiser performance.

6. We will determine the size, placement, and positioning of your ads.

7. Scheduling of delivery is subject to availability and may not be continuous.

8. We do not guarantee the reach or performance that your ads will receive, such as the number of people who will see your ads or the number of clicks your ads will get.

9. We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.

10. Our license to deliver your ad will end when we have completed your Order. You understand, however, that:

    a. Once displayed, ads are public information. Ads may be re-shared and accessed outside of the targeted audience (including from the Facebook Page running the ads or within Facebook Products). If users have interacted with your ad, your ad may remain on our Products (*e.g., shared until the users delete it or visible to users through their account tools*).

    b. If your ad is about Social Issues, Elections or Politics, Facebook may display (at no cost to you) and provide access to the ad content and creative, and information about the ad campaign (such as total spend and delivery data, and targeting information) for a period of seven years from the completion of your order.

    c. You consent that Facebook may disclose your advertising content, and all information associated with your advertising, to a governmental entity or body if Facebook believes that disclosure would assist in a lawful investigation.

11. We will provide you with reports about the kinds of people seeing your ads and how your ads are performing. Your use of these reports is subject to the Data Use Restrictions in our Advertising Policies. We may provide a business, and all those who advertise for the business, with information about the number of ads being run for the business across the Facebook Products and any applicable restrictions on those ads.

12. We offer tools to provide transparency to our users about how Facebook advertising works and control over their ads experience, including information sufficient to show them why they are being shown specific ads. You agree that information associated with your advertising may be included in these tools, and that those tools may impact your ability to advertise to those users or to prevent them from seeing your ads.

13. You will not issue any press release or make public statements about your relationship with Facebook or the Facebook Products without our prior written permission.

14. If you are placing ads on someone else's behalf, you must have permission to place those ads, and agree as follows:

    a. You represent and warrant that you have the authority to and will bind the advertiser to these Self-Serve Ad Terms and the Terms of Service, and the Commercial Terms, to which you also agree.

    b. If the advertiser you represent violates these Self-Serve Ad Terms, the Terms of Service, or the Commercial Terms, we may hold you responsible for that violation.

    c. You agree that we may provide campaign reporting information to the end advertiser for whom you placed a campaign.

15. We may ask you to review and accept supplemental terms that apply to your use of a specific feature or functionality made available through the Self-Serve Ad Interfaces. To the extent those supplemental terms conflict with these Self-Serve Ad Terms, the supplemental terms will govern with respect to your use of the specific feature or functionality to the extent of the conflict. We may change or update these Self-Serve Ad Terms from time to time and your continued use of the Self-Serve Ad Interfaces constitutes acceptance of those changes.

16. Contracting party:

    a. If you reside or have your principal place of business in the United States or Canada, Facebook, Inc. provides the Self-Serve Ad Interfaces.

    b. If you reside or have your principal place of business outside the United States or Canada, Facebook Ireland Limited provides the Self-Serve Ad Interfaces, except that advertisers in some countries may under certain circumstances contract directly with Facebook affiliate companies **solely** for purposes of placing Orders. If applicable to you, you can find special provisions applicable to your Orders from those affiliates here.

    c. For the avoidance of doubt, regardless which entity you contract with (as described in Sections 16.a and 16.b), Facebook's Advertising Policies (and its Community Standards as incorporated) are enforced under the Terms of Service by the entity that provides the Facebook Products under the applicable Terms of Service in your region.

17. Any claim, cause of action, or dispute that arises out of or relates to these Self-Serve Ad Terms is subject to the disputes resolution clause in the Commercial Terms.

18. These Self-Serve Ad Terms will terminate in the event of any termination of the Commercial Terms, but the following provisions will still apply: the lead-in paragraph, Sections 2, 4, 8-12 and 15-18.

Effective Date: August 31, 2020.

Cookies    Ad Choices        Terms    Help

Facebook © 2020

# EXHIBIT 4

# EXHIBIT 4

# Facebook

facebook.com/policies/ads

1. Overview

Understanding Our Policies

Our Advertising Policies provide guidance on what types of ad content are allowed. When advertisers place an order, each ad is reviewed against these policies. If you think your ad was mistakenly disapproved, you can request a review of the decision in Account Quality.
Learn More

Common Points of Confusion

To help you build a compliant and user-friendly ads experience we've highlighted some common areas of confusion. Click the links below to learn more about each policy:
2. The Ad Review Process

Before ads show up on Facebook or Instagram, they're reviewed to make sure they meet our Advertising Policies. Typically most ads are reviewed within 24 hours, although in some cases it may take longer.

What We Consider

During the ad review process, we'll check your ad's images, text, targeting, and positioning, in addition to the content on your ad's landing page. Your ad may not be approved if the landing page content isn't fully functional, doesn't match the product/service promoted in your ad or doesn't fully comply with our Advertising Policies.



What Happens After an Ad is Reviewed?

After your ad is reviewed, you'll receive a notification letting you know if your ad is approved. If it's approved, we'll start running your ad and you can see your results in the Ads Manager.

3. Steps to Take if Disapproved

Edit Your Ad

If your ad isn't approved for not fully complying with our policies, you can edit it and resubmit for review. To edit your ad:
1. Check the email address associated with your advertising account. If your ad doesn't get approved, we'll send you an email with details that explain why.
2. Using the information in your disapproval email, you can edit your ad and create a compliant one. Check this page for editing steps.
3. Save your edited changes. Once you save your changes, your ad will be resubmitted for review.

Appeal the Decision

If you can't edit your ad or feel it was a mistake that it wasn't approved, you can request a review of the decision in Account Quality.

4. Prohibited Content

1. Community Standards

Ads must not violate our Community Standards. Ads on Instagram must not violate the Instagram Community Guidelines.

2. Illegal Products or Services

Ads must not constitute, facilitate, or promote illegal products, services or activities. Ads targeted to minors must not promote products, services, or content that are inappropriate, illegal, or unsafe, or that exploit, mislead, or exert undue pressure on the age groups targeted.

3. Discriminatory Practices

Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition.

Learn More

4. Tobacco and Related Products

Ads must not promote the sale or use of tobacco products and related paraphernalia. Advertisements must not promote electronic cigarettes, vaporizers, or any other products that simulate smoking.

Learn More

5. Drugs & Drug-Related Products

Ads must not promote the sale or use of illegal, prescription, or recreational drugs.

Learn More

6. Unsafe Supplements

Ads must not promote the sale or use of unsafe supplements, as determined by Facebook in its sole discretion.

Learn More

7. Weapons, Ammunition, or Explosives

Ads must not promote the sale or use of weapons, ammunition, or explosives. This includes ads for weapon modification accessories.

Learn More

8. Adult Products or Services

Ads must not promote the sale or use of adult products or services. Ads promoting sexual and reproductive health products or services, like contraception and family planning must be targeted to people 18 years or older and must not focus on sexual pleasure.

Learn More

9. Adult Content

Ads must not contain adult content. This includes nudity, depictions of people in explicit or suggestive positions, or activities that are overly suggestive or sexually provocative.

Ads that assert or imply the ability to meet someone, connect with them or view content created by them must not be positioned in a sexual way or with an intent to sexualise the person featured in the ad.
Learn More

10. Third-Party Infringement

Ads must not contain content that infringes upon or violates the rights of any third party, including copyright, trademark, privacy, publicity, or other personal or proprietary rights. To report content that you feel may infringe upon or violate your rights, please visit our Intellectual Property Help Center.

11. Sensational Content

Ads must not contain shocking, sensational, inflammatory or excessively violent content.

Learn More

12. Personal Attributes

Ads must not contain content that asserts or implies personal attributes. This includes direct or indirect assertions or implications about a person's race, ethnic origin, religion, beliefs, age, sexual orientation or practices, gender identity, disability, medical condition (including physical or mental health), financial status, voting status, membership in a trade union, criminal record, or name.

Learn More

13. Misinformation

Facebook prohibits ads that include claims debunked by third-party fact checkers or, in certain circumstances, claims debunked by organizations with particular expertise. Advertisers that repeatedly post information deemed to be false may have restrictions placed on their ability to advertise on Facebook. Find out more about Fact Checking on Facebook here.

Learn More

14. Controversial Content

Ads must not contain content that exploits crises or controversial political or social issues for commercial purposes.

Visit our Business Help Center

15. Non-Functional Landing Page

Ads must not direct people to non-functional landing pages. This includes landing page content that interferes with a person's ability to navigate away from the page.

Learn More

16. Cheating and Deceitful Practices

Ads may not promote products or services that are designed to enable a user to engage in cheating or deceitful practices.

Learn More

17. Grammar & Profanity

Ads must not contain profanity or bad grammar and punctuation. Symbols, numbers and letters must be used properly without the intention of circumventing our ad review process or other enforcement systems.

Learn More

18. Nonexistent Functionality

Ads must not contain images that portray nonexistent functionality. This includes imagery that replicates play buttons, notifications, or checkboxes, as well as ads containing features that do not work, such as multiple choice options in the ad creative itself.

Learn More

19. Personal Health

Ads must not contain "before-and-after" images or images that contain unexpected or unlikely results. Ad content must not imply or attempt to generate negative self-perception in order to promote diet, weight loss, or other health related products.

Learn More

20. Payday Loans, Paycheck Advances, and Bail Bonds

Ads may not promote payday loans, paycheck advances, bail bonds, or any short-term loans intended to cover someone's expenses until their next payday. Short term loan refers to a loan of 90 days or less.

21. Multilevel Marketing

Ads promoting income opportunities must fully describe the associated product or business model, and must not promote business models offering quick compensation for little investment, including multilevel marketing opportunities.

Learn More

22. Penny Auctions

Ads may not promote penny auctions, bidding fee auctions, or other similar business models.

23. Misleading Claims

Ads must not contain deceptive, false, or misleading claims like those relating to the effectiveness or characteristics of a product or service, including misleading health, employment or weight-loss claims that set unrealistic expectations for users.

Learn More

24. Low Quality or Disruptive Content

Ads must not contain content leading to external landing pages that provide an unexpected or disruptive experience. This includes misleading ad positioning, such as overly sensationalized headlines or prompts for users to inauthentically interact with the ad, and leading people to landing pages that contain minimal original content and a majority of unrelated or low quality ad content. For more information on what we consider low quality, visit our Ads Help Center.
Learn More

25. Spyware or Malware

Ads must not contain spyware, malware, or any software that results in an unexpected or deceptive experience. This includes links to sites containing these products.

26. Automatic Animation

Ads must not contain audio or flash animation that plays automatically without a person's interaction or expands within Facebook after someone clicks on the ad.

27. Unacceptable Business Practices

Ads must not promote products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information.

Learn More

28. Circumventing Systems

Ads must not use tactics intended to circumvent our ad review process or other enforcement systems. This includes techniques that attempt to disguise the ad's content or destination page.

Learn More

29. Prohibited Financial Products and Services

Ads must not promote financial products and services that are frequently associated with misleading or deceptive promotional practices.

Learn More

30. Sale of Body Parts

Ads must not promote the sale of human body parts or fluids.

31. Vaccine Discouragement

Ads must not discourage people from vaccination or advocate against vaccines.

Learn More

5. Restricted Content

1. Alcohol

Ads that promote or reference alcohol must comply with all applicable local laws, required or established industry codes, guidelines, licenses and approvals, and include age and country targeting criteria consistent with Facebook's targeting requirements and applicable local laws. Note that our policies prohibit ads promoting or referencing alcohol in some countries, including but not limited to: Afghanistan, Brunei, Bangladesh, Egypt, Gambia, Kuwait, Libya, Lithuania, Norway, Pakistan, Russia, Saudi Arabia, Thailand, Turkey, United Arab Emirates and Yemen.

Learn More

2. Dating

Ads for dating services are only allowed with prior written permission. These must adhere to the dating targeting requirements and our dating ad guidelines. Details on the requirements for permission can be found here.
Learn More

3. Online Gambling and Gaming

Ads that promote online gambling, and gaming where anything of monetary value (including cash or digital/virtual currencies, e.g. bitcoin) is required to play and anything of monetary value forms part of the prize, are only allowed with our prior written permission. This includes games where purchases are required to continue game play and/or provide advantage in winning prizes, in cases where the prize is of monetary value. Authorized advertisers must follow all applicable laws, including targeting their ads in accordance with legal requirements. At a minimum, ads may not be targeted to people under 18 years of age. Apply for Permission in our Contact Form Learn More in our Business Help Center
Learn More

4. Online Pharmacies

Ads must not promote the sale of prescription pharmaceuticals. Ads for online and offline pharmacies are only permitted with prior written permission.

5. Promotion of Over-The-Counter Drugs

Ads that promote over-the-counter medicines must comply with all applicable local laws, required or established industry codes, guidelines, licenses and approvals, and include age and country targeting criteria consistent with applicable local laws.

6. Subscription Services

Ads for subscription services, or that promote products or services that include negative options, automatic renewal, free-to-pay conversion billing products, or mobile marketing are subject to our subscription services requirements.

Learn More

7. Financial and Insurance Products and Services

Ads promoting credit card applications, or financial services with accredited institutions must clearly provide sufficient disclosure regarding associated fees, including APR percentages, transaction fees, interest rates and the physical address of the entity offering the product within the ad's landing page. Ads promoting credit cards, loans or insurance services must be targeted to people 18 years or above. Ads promoting credit cards, loans or insurance services must not directly request the input of a person's financial information, including credit card information.

Learn More

8. Branded Content

Ads promoting branded content must tag the featured third party product, brand or business partner using the branded content tool. Branded content within ads is defined as a creator or publisher's content that features or is influenced by a business partner for an exchange of value. When promoting branded content integrations, advertisers must use the branded content tool (please learn more <u>here</u> on how to tag the featured third party product, brand or business partner).

9.a Ads About Social Issues, Elections or Politics

Advertisers can run ads about social issues, elections or politics, provided the advertiser complies with all applicable laws and the authorization process required by Facebook. Where appropriate, Facebook may restrict issue, electoral or political ads. In addition, certain content related to elections may be prohibited in specific regions ahead of voting; <u>click here for more</u>.

Learn More

9.b Disclaimers for Ads About Social Issues, Elections or Politics

If Facebook's ad authorization process is available in your country, in addition to complying with the Community Standards and Advertising Policies, the disclaimer you submit for your ad about social issues, elections or politics must comply with the following guidelines. This information is provided by you during the ad authorization process and will be displayed on your ad's header.
Learn More

10. Cryptocurrency Products and Services

Ads may not promote cryptocurrency trading or related products and services without prior written permission. Details on the requirements for permission can be found, here.
Learn More

11. Drug and Alcohol Addiction Treatment

Facebook requires advertisers who wish to run addiction treatment ads targeting the USA to be certified with LegitScript, and apply to Facebook for permission to advertise.

Addiction treatment ads include, but are not limited to: Clinical addiction treatment services or websites providing information about in-person treatment, online and in-person support groups, and crisis hotlines for those in recovery or who are seeking information about addiction treatment.

Advertisers can apply for certification with LegitScript here.
Learn More

12. Cosmetic Procedures and Weight Loss

Ads marketing weight loss products and services must be targeted to people at least 18 years or older.
Ads marketing cosmetic surgeries and procedures must be targeted to people at least 18 years or older.

Learn More

13. Social Casino Games

Ads for social casino games, which are online games that simulate casino gambling (e.g. poker, slots, roulette etc) where there is no opportunity to win money or money's worth, are allowed only if they are targeted to people 18 years or older. Learn More in our Business Help Center
Learn More

6. Video Ads

Video ads and other dynamic ad types must comply with all of the rules listed in these Advertising Policies, including the Community Standards, as well as the policies below:

1. Disruptive Content

Videos and other similar ad types must not use overly disruptive tactics, such as flashing screens.

2. Entertainment Related Restrictions

Ads for movie trailers, TV shows, video game trailers, and other similar content intended for mature audiences are only allowed with prior written permission from Facebook and must target people who are 18 years or older. Excessive depictions of the following content within these ads are not allowed:
1. Drugs and alcohol use

2. Adult content

3. Profanity

4. Violence and gore

7. Targeting

1. You must not use targeting options to discriminate against, harass, provoke, or disparage users or to engage in predatory advertising practices.

2. If you target your ads to custom audiences, you must comply with the applicable terms when creating an audience.
8. Positioning

1. Relevance

All ad components, including any text, images or other media, must be relevant and appropriate to the product or service being offered and the audience viewing the ad.

2. Accuracy

Ads must clearly represent the company, product, service, or brand that is being advertised.

3. Related Landing Pages

The products and services promoted in an ad's text must match those promoted on the landing page, and the destination site must not offer or link to any prohibited product or service.

Learn more about ad quality best practices that can improve ad performance.

9. Lead Ads

Advertisers must not create Lead Ads questions to request the following types of information without our prior written permission.

1. Account Numbers

Ads must not request account numbers, including frequent flyer numbers, loyalty card numbers, or cable or telephone account numbers without our prior permission.

2. Criminal History

Ads must not request information regarding criminal or arrest history without our prior permission.

Learn More

3. Financial Information

Ads must not request financial information, including bank account numbers, bank routing numbers, credit or debit card numbers, credit scores, income, net worth or how much debt someone has without our prior permission.

Learn More

4. Government Issued Identifiers

Ads must not request government-issued identifiers, including Social Security numbers, passport numbers or driver's license numbers without our prior permission.

5. Health Information

Ads must not request health information, including physical health, mental health, medical treatments, medical conditions or disabilities without our prior permission.

Learn More

6. Insurance Information

Ads must not request insurance information, including current insurance policy numbers, without our prior permission.

Learn More

7. Political Affiliation

Ads must not request information regarding political affiliation.

Learn More

8. Race or Ethnicity

Ads must not request information regarding race or ethnicity without our prior permission.

Learn More

9. Religion

Ads must not request information regarding religion or philosophical beliefs without our prior permission.

Learn More

10. Sexual Orientation

Ads must not request information regarding sexual orientation or information about the sexual life of the individual, including what gender(s) the person prefers to date, without our prior permission.

Learn More

11. Prefill Questions

Ads must not request the same or substantially similar information that you could use a Prefill Question to request.

Learn More

12. Trade Union Membership

Ads must not request information regarding trade Union membership status without our prior permission.

Learn More

13. Usernames or Passwords

Ads must not request usernames or passwords, including usernames and passwords for existing and new accounts, without our prior permission. If you want to direct people to sign up for an account with your site or service, you should use the **Clicks to Website** or **Website Conversions** objective when you run your ads.

Learn More

10. Use of Our Brand Assets

For ads that feature the Facebook or Instagram brands please refer to the Facebook Brand Resource Center and the Instagram Brand Resource Center to review brand guidelines and download approved assets.

1. Brand Endorsement

Ads must not imply a Facebook or Instagram endorsement or partnership of any kind, or an endorsement by any other Facebook Company.

2. Brand Usage in Ads

Ads linking to Facebook or Instagram content (including Pages, groups, events or sites that use Facebook Login) may make limited reference to "Facebook" or "Instagram" in ad text for the purpose of clarifying the destination of the ad. Ads should not represent the Facebook brand in a way that makes it the most distinctive or prominent feature of the creative. Facebook brand assets should not be modified in any way, such as by changing the design or color, or for the purpose of special effects or animation.

Learn More

3. Copyrights & Trademarks

All other ads and landing pages must not use our copyrights, trademarks, or any confusingly similar marks, except as expressly permitted by the Facebook Brand Resource Center and the Instagram Brand Resource Center, or with our prior written permission.

4. User Interface Screenshots

When featuring the Facebook, Messenger or Instagram User Interface (UI) in an ad, it must accurately depict how the UI currently appears and functions in product. If an action or functionality depicted cannot happen in the current product or within the current UI then it cannot appear to happen in an ad. Depictions of the UI in ads must be featured within the context of a relevant device (ex, mobile or desktop) and as permitted by the Facebook Brand Guidelines or Instagram Brand Guidelines. The UI may not be modified in any way, including, but not limited to: adding special effects, interference or animation. Glyphs or elements of the UI may not be used separately or individually.

11. Data Use Restrictions

1. Ensure any ad data collected, received or derived from your Facebook or Instagram ad ("Facebook advertising data") is only shared with someone acting on your behalf, such as your service provider. You are responsible for ensuring your service providers protect any Facebook advertising data or any other information obtained from us, limit their use of all of that information, and keep it confidential and secure.

2. Don't use Facebook advertising data for any purpose (including retargeting, commingling data across multiple advertisers' campaigns, or allowing piggybacking or redirecting with tags), except on an aggregate and anonymous basis (unless authorized by Facebook) and only to assess the performance and effectiveness of your Facebook advertising campaigns.

3. Don't use Facebook advertising data, including the targeting criteria for your ad, to build, append to, edit, influence, or augment user profiles, including profiles associated with any mobile device identifier or other unique identifier that identifies any particular user, browser, computer or device.

4. Don't transfer any Facebook advertising data (including anonymous, aggregate, or derived data) to any ad network, ad exchange, data broker or other advertising or monetization related service.

12. Things You Should Know

1. The Advertising Policies apply to (1) ads and commercial content served by or purchased through Facebook, on or off the Facebook services, including ads purchased under AAAA/IAB Standard Terms and Conditions, (2) ads appearing within apps on Facebook, and (3) ads on Instagram. Your use of Facebook's advertising products and services is part of "Facebook" under Facebook's Statement of Rights and Responsibilities (https://www.facebook.com/legal/terms, the "SRR") and is subject to the SRR.You may be subject to additional terms or guidelines if you use Instagram or certain Facebook advertising-related products or services.

2. Advertisers are responsible for understanding and complying with all applicable laws and regulations. Failure to comply may result in a variety of consequences, including the cancellation of ads you have placed and termination of your account.

3. We do not use sensitive personal data for ad targeting. Topics you choose for targeting your ad don't reflect the personal beliefs, characteristics or values of the people who use Facebook or Instagram.

4. Once displayed, ads are public information. Ads may be re-shared and accessed outside of the targeted audience, including from the Facebook Page running the ads or within Facebook Products. If users have interacted with your ad, your ad may remain on Facebook products (for example, shared until the users delete it or visible to users through their account tools). If your ad is a political ad, it will be displayed in our Ad Archive. This means that Facebook may display (at no cost to you) and provide access to the ad content and creative, as well as information about the ad campaign (such as total spend and delivery data) for a period of seven (7) years from the completion of your order. Facebook may disclose your advertising content, and all information associated with your advertising, to a governmental entity or body if Facebook believes that disclosure would assist in a lawful investigation.

5. If you are managing ads on behalf of other advertisers, each advertiser or client must be managed through separate ad accounts. You must not change the advertiser or client associated with an established ad account; set up a new account. You are responsible for ensuring that each advertiser complies with these Advertising Policies.

6. We reserve the right to reject, approve or remove any ad for any reason, in our sole discretion, including ads that negatively affect our relationship with our users or that promote content, services, or activities, contrary to our competitive position, interests, or advertising philosophy.

7. For policies that require prior written permission, Facebook or a <u>Facebook Company</u> may grant these permissions.

8. These policies are subject to change at any time without notice.

# EXHIBIT 5

# EXHIBIT 5

Sign Up

Join or Log Into Facebook

## Audience Network Terms

These Audience Network Terms (**"Audience Network Terms"**) are made and entered into by and between Facebook, Inc. and Facebook Ireland Limited (**"FB"**) and the person or entity accepting these Audience Network Terms (**"Publisher"**). These Audience Network Terms are deemed accepted and agreed to by Publisher on the date that Publisher indicates its assent to these Audience Network Terms by clicking "agree" or "accept" (the **"Effective Date"**). If you are accepting on behalf of a legal entity, you represent and warrant that you are an authorized representative of such entity with the authority to bind it to these Audience Network Terms.

1. **General Terms.** FB will work with Publisher to facilitate the placement of third party and/or FB advertisements or other commercial or sponsored content (**"Ads"**) on certain of Publisher's properties, which may include Publisher's mobile applications, as set forth in the Audience Network Policy (as defined below) and approved by FB in its sole discretion (**"Publisher Properties"**). If applicable, FB will work with Publisher to facilitate the placement of Ads on Publisher's articles displayed on Facebook through use of Facebook Instant Articles or Publisher's games displayed through Facebook's products or services through use of Facebook Instant Games, in which case such articles and/or games shall also be deemed "**Publisher Properties**" hereunder. Publisher agrees that these Audience Network Terms will apply to any use by Publisher of the Audience Network Service (as defined below). As between FB and Publisher, FB retains exclusive ownership of the Audience Network Service (which, for clarity, excludes Publisher Properties).

2. **Audience Network Participation.** Publisher agrees that FB may serve Ads on the Publisher Properties (the **"Audience Network Service"**). Publisher will participate in the Audience Network Service during the Term in accordance with these Audience Network Terms. Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and FB will use good faith efforts to provide Publisher with notice of the same; and (b) agrees that to the extent Publisher elects to report to FB problems, issues, ideas, feedback and suggestions for enhancements to and improvements to performance of the Audience Network Service (**"Program Feedback"**), such Program Feedback is entirely voluntary on part of Publisher and may be used without obligation of any kind to Publisher.

3. **Implementation.**
   1. Publisher will comply with the Audience Network Service specifications provided by FB from time-to-time to enable proper delivery, display, tracking and reporting of Ads, including without limitation, by not modifying, misusing or deriving data from the technology (e.g., the FB SDK, FB tags, or FB API's, as applicable) made available to Publisher by FB (the **"FB Tools"**). FB may modify, suspend, or terminate Publisher's access to, or discontinue the availability of, the FB Tools at any time. Publisher may use the FB Tools solely in accordance with FB's Platform Policy (currently available at https://developers.facebook.com/policy/) ("**Platform Policy**") that are applicable to use of FB's platform.
   2. With respect to the Publisher Properties, Publisher will integrate the applicable FB Tools provided by FB in connection with the Audience Network Service as soon as reasonably practicable. During the Term, if FB provides an updated version of the FB Tools, Publisher will update the Publisher Properties to include the updated version of such FB Tools as soon as reasonably practicable.
   3. Publisher will comply with FB's Audience Network Policy (currently available at https://developers.facebook.com/docs/audience-network/policy) (the "**Audience Network Policy**"). Publisher will be solely responsible for all aspects of the Publisher Properties, including all content therein.
   4. Any placement of Ads on the Publisher Properties will be subject to the Audience Network Policy.
   5. In connection with Publisher's use of the Audience Network Service, Publisher may implement either a tag-based integration ("Tag Integration") or a bidding integration ("**Bidding Integration**"). For Bidding Integrations, Publisher acknowledges and agrees that Publisher may only integrate with an FB-approved bidding technology service provider or implement Publisher's own bidding technology as approved by FB in writing (email to suffice).

4. **Payment.**
   1. Each month during the Term, for all Publisher Properties on which Ads were displayed during the previous month, (a) for Tag Integrations, FB will pay Publisher a percentage of Net Revenue (defined below) arising from such Publisher Properties for the previous month as solely determined by FB, and (b) for Bidding Integrations, FB will pay Publisher the bid amount specified in a bid response for the delivery of an Ad to Publisher Properties for all Ads delivered to Publisher that were viewable (as determined by FB) during the previous month. All payments will be made in accordance with this Section 4.1 unless otherwise agreed to by FB in writing. "**Net Revenue**" means (a) the amounts actually collected by FB from advertisers for Ads displayed on Publisher Properties using Tag Integrations, minus (b) deductions for fraud, bad debt, chargebacks, refunds, credit card processing fees, and any other third party fees. Publisher agrees to accurately complete and timely provide to FB any forms or documentation that FB determines is required to set up payment to Publisher, and Publisher may update such payment information upon notice to FB provided that such information is complete and accurate and Publisher has the requisite authority to provide such information. Subject to the foregoing, approximately 21 days following the end of the calendar month in which the transaction occurred, FB will pay Publisher the amounts associated with such calendar month. In the event a payment from FB to Publisher for any given pay period would be less than One Hundred United States Dollars ($100.00), FB reserves the right to roll such payment over month to month until such threshold is met (unless Publisher's account is being deactivated or terminated), at which time FB will make the applicable payment to Publisher. FB reserves the right to deduct from any payments due or payable to Publisher any amounts that are past due and remain uncollected by FB from Publisher in connection with any other FB product or service.
   2. Publisher will not, and will not authorize or encourage any third party to, directly or indirectly, generate impressions, clickthroughs, conversions or other actions with respect to an Ad through any automated, deceptive, fraudulent or otherwise invalid means, including through repeated manual clicks, the use of "robots" or other automated tools, or by payment of money, false representation, or any illegal or otherwise invalid for end users to take actions with respect to an Ad. Notwithstanding anything to the contrary in these Audience Network Terms, FB will not be liable for any payment (a) based on such fraudulent activity or invalid activity, as determined by FB in its discretion, or (b) in the event of any breach by Publisher of these Audience Network Terms (including the Audience Network Policy) during any applicable pay period. FB reserves the right to withhold payment or charge back Publisher's account due to any of the foregoing pending FB's investigation, or in the event that an advertiser whose Ads are displayed in connection with Publisher Properties defaults on payment for such Ads. FB's records and figures will be used to determine all payments.
   3. Publisher will provide FB with applicable tax forms, documents, or certifications as may be required by applicable law for FB to satisfy any information reporting and/or withholding tax obligations with respect to any payments hereunder. Where applicable, Publisher agrees that Publisher will be solely responsible for compliance with local tax regulations. Where applicable within the European Union, Publisher (A) agrees that FB will prepare and issue VAT invoices under self-billing arrangement, (B) acknowledges and accepts the validity of such self-billed invoices, and (C) agrees that Publisher will be responsible for timely remittance to applicable tax authorities of any tax amounts on such self-billed invoices that were paid to Publisher by FB.

5. **Privacy and Data.**
   1. With respect to Publisher Properties, Publisher will (a) comply with all applicable privacy and data laws and regulations and industry and government guidelines (including but not limited to, the Children's Online Privacy Protection Act (COPPA) and the Digital Advertising Alliance's Self-Regulatory Principles); and (b) provide (i) robust and sufficiently prominent notice to and obtain the necessary consent in accordance with applicable laws from users regarding the collection, sharing and use of data by FB and its affiliates that, at a minimum, includes a clear and prominent notice that third parties, including FB, may use cookies, web beacons, and other storage technologies to collect or receive information from Publisher Properties and use that information to provide measurement services and target ads, (ii) information on how users can opt-out of the collection and use of information for ad targeting, and (iii) information on where a user can access a mechanism for exercising such choice (e.g., providing links to: http://www.aboutads.info/choices and http://www.youronlinechoices.eu). In jurisdictions that require informed consent for the storing and accessing of cookies or other information on an end user's device (such as but not limited to the European Union), Publisher must ensure, in a verifiable manner, that an end user provides any

necessary consent before Publisher uses the FB Tools to enable FB to store and access cookies or other information on the end user's device. (For suggestions on implementing consent mechanisms, visit Facebook's Cookie Consent Guide for Sites and Apps).

2. Publisher will not collect or store any data collected, derived or obtained from any Ad or use of the Audience Network Service (**"FB Advertising Data"**), except solely as necessary to implement the Audience Network Service in accordance with these Audience Network Terms. For clarity, any data provided by FB in connection with a bid response, including any bid amounts (**"Bid Response Data"**) will be deemed FB Advertising Data. For the avoidance of doubt, Publisher may only use Bid Response Data to determine whether the bid response is the winning bid for the applicable Ad inventory. If a bid response is not the winning bid, Publisher must not use the Bid Response Data for any purpose and will delete such data within thirty (30) minutes of receipt thereof. If a bid response is the winning bid, Publisher may only use the Bid Response Data for internal billing and auditing of the winning bid price for the Ad inventory, and Publisher will delete the Bid Response Data within ninety (90) days of receipt thereof.

3. Without limiting the generality of any of the foregoing restrictions, Publisher agrees that it will not (a) collect, store, or use any information about any user derived from the Ad served by FB to such user on the Publisher Properties, including information derived from the content of the Ad creative, a user's engagement with the Ad, or the content accessed by a user after navigating to the Ad landing page; (b) use (i) data from the Audience Network Service to categorize a user of Publisher Properties as a FB user, (ii) identifiers provided by FB to retarget users or deliver advertising based on user behaviors apart from the Audience Network Service, or (iii) any FB Advertising Data to build or enhance profiles, including any profiles associated with any personally identifiable information, mobile device identifier, or other unique identifier that identifies any particular individual, user, browser, computer or device; or (c) directly or indirectly, transfer or sell any FB Advertising Data to any third party. In addition, with respect to Publisher Properties, Publisher will (y) deploy administrative, physical and technical safeguards that prevent unauthorized access to any FB Advertising Data in its possession or control; and (z) provide FB with reasonably prompt written notice as soon as it becomes aware that it has or is likely to breach any of the terms set forth in this Section.

4. FB will comply with its own publicly-posted data policy (currently available at https://www.facebook.com/policy.php) (**"Data Policy"**) in connection with FB's performance and use of data under these Audience Network Terms. In connection with receiving inventory from Publisher Properties through the Audience Network Service, FB will receive data from Publisher Properties, which may include mobile device identifiers for advertising purposes (**"Specified Data"**), and such Specified Data will be used in accordance with FB's Data Policy. In connection with FB's use of data for ad targeting and optimizing FB's systems, FB: (a) will use Specified Data for optimization only after aggregating such Specified Data with other data collected from other publishers, advertisers or otherwise collected on Facebook Products; and (b) will not allow other advertisers or third parties to target advertising solely on the basis of Specified Data.

5. To the extent that FB processes personal data through Publisher Properties to provide the Audience Network Service subject to the General Data Protection Regulation (Regulation (EU) 2016/679) (**"GDPR"**), FB acknowledges that it is a data controller of that personal data.

6. The parties acknowledge and agree that the State Specific Terms (currently available at https://www.facebook.com/legal/terms/state-specific) apply to the provision and use of the Audience Network Service, and are incorporated herein by reference.

7. For clarity, the terms and conditions of FB's Platform Policy regarding the collection, sharing and use of data by FB or its affiliates apply to the Audience Network Service.

6. **Confidentiality. "Confidential Information"** of a party means any and all nonpublic product plans or business plans disclosed by such party to the other party in connection with the Audience Network Service, and that is marked or designated as confidential at the time of disclosure. During and after the Term, each party (a) will use the same degree of care to protect the Confidential Information of the other party as it uses to protect its own most highly confidential information, but in no circumstances less than reasonable care; and (b) will not disclose the Confidential Information of the other party to any person or entity other than its officers, employees, and consultants who need access to such Confidential Information to effect the intent of these Audience Network Terms and who are bound by written confidentiality obligations consistent with this Section. The foregoing confidentiality obligations impose no obligations with respect to information which: (w) was in a party's possession before receipt from the other party; (x) is or becomes a matter of public knowledge through no fault of a party; (y) was rightfully disclosed to a party by a third party without restriction on disclosure; or (z) is developed by a party without use of the Confidential Information of the other party as can be shown by documentary evidence. A party may make disclosures to the extent required by law or court order, provided such party makes commercially reasonable efforts to provide the other party with notice of such disclosure as promptly as possible and provides reasonable cooperation to the other party in connection with any attempt to contest or limit such disclosure. Without limiting the foregoing, Publisher will not issue any press release or otherwise make any public statements or disclosures (including to the internet press, e.g., any blogs) regarding these Audience Network Terms and the transactions contemplated hereby or consummated hereunder or about the relationship of the parties without the prior written approval of FB.

7. **Term and Termination.** The term of these Audience Network Terms will begin on the Effective Date and continue until terminated in accordance with this Section 7 (**"Term"**). These Audience Network Terms may be terminated by either party with or without cause immediately upon written notice to the other party; provided, however, that if Publisher provides written notice of termination, such termination will be deemed effective only after Publisher ceases to use the Audience Network Service. Sections 2.b and 5–8 of these Audience Network Terms will survive any termination or expiration of the Audience Network Terms.

8. **Miscellaneous.** These Audience Network Terms govern Publisher's use of the Audience Network Service. The Audience Network Service (including the FB Tools) is a Facebook Product under FB's Terms of Service (currently at https://www.facebook.com/legal/terms/update, the **"Terms of Service"**), which is incorporated herein by reference. In the event of any conflict or inconsistency between the provisions of these Audience Network Terms and the provisions of the Terms of Service, the provisions of these Audience Network Terms will control, but only with respect to the subject of these Audience Network Terms. The provisions of the Terms of Service will survive any termination or expiration of these Audience Network Terms to the extent Publisher continues to use any other features or services of FB thereafter. FB may update or modify these Audience Network Terms at any time (via email or by posting notice on the FB site). Publisher's continued use of the Audience Network Service after such update will be deemed Publisher's acceptance of the updated Audience Network Terms.

Effective Date: April 15, 2020

English (US)   Français (Canada)   Español   中文(简体)   한국어   日本語   Português (Brasil)   Deutsch   Italiano   العربية   हिन्दी   [ ]

Sign Up   Log In   Messenger   Facebook Lite   Watch   People   Pages   Page Categories   Places   Games   Locations   Marketplace   Groups   Instagram
Local   Fundraisers   Services   About   Create Ad   Create Page   Developers   Careers   Privacy   Cookies   Ad Choices   Terms   Help

Facebook © 2020

# EXHIBIT 6

# EXHIBIT 6

# A business owner who spent nearly $46 million on Facebook advertising says he's been booted from the platform without explanation

ǀ **businessinsider.com**/facebook-removed-shared-ceo-spent-46-million-on-ads-2021-1

Allana Akhtar Jan 8, 2021, 10:28 AM



Facebook CEO Mark Zuckerberg.
Associated Press

- Jordan Nabigon, the CEO of the content-curation site <u>Shared</u>, spent nearly $46 million between 2006 and 2020 on Facebook advertising before the platform booted him without warning or explanation, he said.
- Facebook said Nabigon's company violated the site's terms and conditions but did not elaborate further "due to safety and security." Several of his company pages have been unpublished since October 26.
- "We didn't do anything wrong and I'm confident in that," Nabigon said in an interview with Insider. "There's no way it was worth this kind of reaction from Facebook."

1/4

- Nabigon and small-business owners say they've struggled to get in touch with Facebook customer service to remedy issues with advertising.
- "The pages and accounts associated with this business have repeatedly broken our advertising rules, including intellectual property violations, posting misinformation and promoting deceptive offers," a Facebook spokesperson told Insider in response to this article.
- Visit Business Insider's homepage for more stories.

A business owner who spent nearly $46 million over the years on Facebook ads said he got booted from the platform without warning.

Jordan Nabigon, the CEO of the Ottawa, Ontario, content-curation site Shared, said Facebook deleted his company's main Facebook page without warning in October, and without providing an explanation. He shared a Medium post detailing his experience, which has received more than 400 "claps" from readers.

Nabigon spent $45,870,181 on Facebook advertising between 2006 and 2020 for Shared and his other company, Freebies, according to expense reports reviewed by Insider. Shared employees three people full-time and 12 contract writers, Nabigon said.

Facebook increased its use of artificial intelligence to oversee advertising and other content during the COVID-19 pandemic, and Nabigon is among hundreds of business owners who said they suffered from Facebook's crackdown on ad policies.

***Read more:** TikTok gets blasted by lawmakers for quietly sending job applicants' personal data to China: 'This undermines every statement they've made'*

"We didn't do anything wrong and I'm confident in that," Nabigon said in an interview with Insider. "Even if there was something that was off, there's no way it was worth this kind of reaction from Facebook."

A Facebook spokesperson said Shared had broken advertising rules, which prompted the company to unpublish pages.

"The pages and accounts associated with this business have repeatedly broken our advertising rules, including intellectual property violations, posting misinformation and promoting deceptive offers," the Facebook spokesperson told Insider. "While they claim they are giving people 'free' access to coupons and products, our investigation indicated that people have never received their products and/or have been repeatedly charged. Our priority is to support and empower small businesses looking to grow on Facebook, not those that seek to mislead or scam people out of money."

According to Nabigon, Facebook told him he had violated the platform's terms and conditions but did not elaborate further "due to safety and security." The small-business owner said Facebook gave him no warning it could or would unpublish his pages and that

Facebook told him the decision was final.

Facebook says it does not give advertisers who maliciously violate its policies advanced notice of being disabled.

Nabigon lost several company pages that had amassed 21 million followers because of the faulty violations, he said. Facebook has also locked Nabigon out of his personal account.

Insider's Tyler Sonnemaker spoke with seven other business owners, who run ads for companies that sell things like dog products and women's jewelry and said they lost revenue because of Facebook glitches.

And small-business owners, similar to Nabigon, said they struggled getting in touch with Facebook ad representatives to get help fixing problems.

In 2010, Adweek reported Facebook assigned an account representative if an account spent more than $10,000 on ads. But Facebook's website now says the company assigns advertisers with account managers "proactively."

"Currently, there is no process for advertisers to request a personal Account Manager," Facebook's website says. "If it's determined your account would benefit from additional account management resources, we will reach out to you directly."

Nabigon said between 2012 and 2017 he worked with representatives at the Facebook Toronto office to get personalized help reading the site's advertising policy and ensuring company pages stayed violation-free. Nabigon said Facebook employees reached out to him directly and met with him for hourlong counseling sessions.

***Read more:*** *Instagram has privately advised some creators on how often to post, offering a rare glimpse into how its mysterious algorithm works*

But in 2017, Facebook emailed Nabigon telling him he would not have an account representative "for the time being." He and other executives instead emailed customer service, which could provide only "canned answers" regarding the company's violation and offered little additional help, Nabigon said. Shared's company pages have been unpublished since October 26.

"I think there's a lot of strength in keeping the real people who are supposed to be monitoring the AI or the policy enforcement," Nabigon said. "We need somebody to look at the nuance and the complexity of our business, especially considering our history with [Facebook] is long."

*This article has been updated to add the number of people Shared employees and remove Nabigon's description as a "small business owner." The article was later updated to add Facebook's comment.*

Newsletter

Start your day with the biggest stories in tech. Sign up for 10 Things in Tech.

By clicking 'Sign up', you agree to receive marketing emails from Insider as well as other partner offers and accept our Terms of Service and Privacy Policy.

**SEE ALSO: Billionaire Jack Ma hasn't been seen in 2 months. Here's what happened to other Chinese businessmen who mysteriously disappeared from the public after sparring with regulators.**

**NOW WATCH:**

More: Facebook Facebook Advertising Small Business

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of this document has been served on all parties through counsel of record on April 15, 2022 via the Court's CM/ECF system.

_____

Seth W. Wiener