Seth W. Wiener, California State Bar No. 203747
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
Telephone: (925) 487-5607
Email: seth@sethwienerlaw.com


W. Cook Alciati (admitted *pro hac vice*)
Gardella Grace P.A.
80 M Street SE, 1st Floor
Washington D.C., 20003
Telephone: (703) 721-8379
Email: calciati@gardellagrace.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARED PARTNERSHIP | **CIVIL NO.: 3:22-cv-02366-RS** |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| META PLATFORMS, INC. | |
| Defendant. | |

Plaintiff Shared Partnership ("Shared") alleges as follows against Defendant Meta Platforms, Inc. f/k/a Facebook, Inc. ("Facebook").

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and Plaintiff is a citizen of a state different from Defendant.

2.    This Court has personal jurisdiction over Defendant at least because Facebook is headquartered in California and conducts business in the state of California.

3.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

4.    Venue is also proper because Facebook's Terms of Service require that claims brought by a business located outside of the United States be resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County…." *See* Ex. 1, 2022 Commercial Terms.[1]

5.    As a Canadian company with its place of business in Ontario, Shared's claims against Facebook are not subject to arbitration.

## PARTIES

6.    Plaintiff Shared is a Partnership, formed in Ontario, and its principal place of business is 31C Cresthaven Drive, Nepean, Ontario, Canada, K2G 6T8.  Shared's partners are all residents of Canada.

---

[1] Ex. 1 represents Facebook's current commercial terms.  Since 2018, Facebook's commercial terms have required businesses located outside of the United States to bring their claims in this Court.  *See* Ex. 2, 2018 Commercial Terms.

7.     Defendant Facebook, Inc. is incorporated in Delaware, and its principal place of business is 1601 Willow Road, Menlo Park, CA 94025.

## FACTUAL ALLEGATIONS

8.     Shared began its business relationship with Facebook in 2008 when it began advertising through Facebook's self-serve advertising product.

9.     Shared is a content publisher that creates and publishes original, timely, and entertaining content.  In addition to the Shared.com domain, Shared operated on Facebook with at least the following Facebook Pages:  Shared, Shared Food, Savvy, Shared Vintage, and Shared Animals (the "Shared Pages").

10.     Shared was founded, by James Walker and is owned by James Walker and Jordan Nabigon.  In 2017, Mr. Nabigon was selected for inclusion in QuantumShift, which is a program for Canada's Top Entrepreneurs put on by the Ivey School of Business and KPMG. QuantumShift is sponsored by The Globe and Mail and TD Bank and selects 50 individuals each year.

11.     At its peak, Shared employed eighty individuals between its offices in Ottawa and Toronto within the province of Ontario, Canada.

12.     Between 2006-2020, Shared spent approximately $53,000,000 on Facebook advertising.[2]  Through that ad spend, and its dedicated efforts over many years, Shared was able to build an audience of approximately 25,000,000 followers across the Shared Facebook Pages.

13.     In view of its success, Shared received an offer of purchase in the amount of $35,000,000 in 2017, which represented a valuation of seven times EBIDTA.

---

[2] All dollar figures referred to herein refer to Canadian Dollars unless otherwise specified.

14.     Shared was involved with Facebook advertising in two ways: 1) Shared availed itself of Facebook's self-serve advertising product; and 2) Shared participated in the Instant Articles monetization feature of the Audience Network.

15.     Facebook's self-serve advertising service allows customers like Shared to purchase ads, which Facebook will place throughout its "news feed". Shared provided Facebook with a budget, and Facebook charged Shared based on clicks and/or impressions. Among other ads, Shared would purchase self-serve ads asking Facebook users to like the Shared Facebook Pages, which in turn would promote Shared's content within Facebook's news feed. This would drive traffic to Shared's website allowing Shared to sell advertising to other parties. Shared's use of the Facebook self-serve advertising product was governed by the Self-Serve Ad Terms (Ex. 3),[3] Advertising Policies (Ex. 4), and Commercial Terms (Exs. 1 and 2).

16.     Facebook's Instant Articles monetization feature of the Audience Network operates by embedding Shared content in the news feed on Facebook. The user clicks on the content, but rather than being directed to Shared's website outside of the Facebook ecosystem, the article appears within Facebook. Facebook would place ads from businesses other than Shared within Shared's article. Facebook would then pay Shared a portion of Facebook's advertising revenue generated from placing ads within Shared's content. Instant Articles is available to eligible Facebook publishers, but the monetization feature is specific to the Facebook Audience Network.

17.     Facebook's "Instant Articles" webpage explains that an "Instant Article is an HTML document that loads very quickly in Facebook giving publishers the ability to tell rich stories in a branded and customizable article format that renders fast on mobile." Ex. 7 at 1.

---

[3] Ex. 3 is a copy of the Facebook's Self-Serve Ad Terms as they existed in October 2020 when Facebook suspended Shared's advertising account as retrieved from the "Internet Archive," referred to as the "Way Back Machine."

Facebook further explains that "Instant Articles provides a faster, Facebook-native way to distribute the content publishers already produce for their own websites." *Id*. at 2.  To be eligible for posting as an Instant Article, the content "must be published on a news publisher's website as well." *Id*. Facebook further explains:

> Instant Articles are ranked in Feed by the same criteria that we use to rank standard articles on the mobile web. Feed ranks stories based on a number of factors, including the amount people interact with them and how much time people spend reading them.

*Id*.

18.    Facebook also provides its Instant Articles users with a "Quickstart Guide," which explains how a Facebook user (referred to as a publisher) can tailor content to succeed within the Facebook ecosystem such that it is promoted within a given user's news feed.  *See* Ex. 8.  Thus, Facebook encourages its users to tailor content specifically to succeed on Facebook's unique and powerful platform.

19.    In order to be successful in using the Instant Articles feature, Shared needed interesting content, which would drive interactions with the content and increase the distribution of the content within a user's news feed (reach).  The more the content is distributed in users' news feeds, the more users would navigate to Shared's content, and the more incentive Facebook would have to place ads within Shared's Instant Articles, which would drive revenues for Shared.  Consequently, Shared invested heavily in content creation.  Shared did so based on, among other factors, its long history with Facebook and in reliance on Facebook's Audience Network Terms (the "FAN Terms"), which in part governed Shared's ability to monetize the Instant Articles.

20.    The FAN terms define the party accepting the terms as the "Publisher."  Ex. 5 at 1.  Section 1 of the FAN terms defines "Publisher Properties" to include "Publisher's articles"

and provide that "FB will work with Publisher to facilitate the placement of Ads on Publisher's articles displayed on Facebook through use of Facebook Instant Articles . . . in which case such articles . . . shall also be deemed 'Publisher Properties' hereunder."  The FAN terms are thus clear that the Publisher owns the content viewable on Facebook while also being clear that Facebook owns the Audience Network service.  The entirety of Section 1 of the FAN terms is reproduced as set forth below:

1. **General Terms**. FB will work with Publisher to facilitate the placement of third party and/or FB advertisements or other commercial or sponsored content (**"Ads"**) on certain of Publisher's properties, which may include Publisher's mobile applications, as set forth in the Audience Network Policy (as defined below) and approved by FB in its sole discretion (**"Publisher Properties"**). If applicable, FB will work with Publisher to facilitate the placement of Ads on Publisher's articles displayed on Facebook through use of Facebook Instant Articles or Publisher's games displayed through Facebook's products or services through use of Facebook Instant Games, in which case such articles and/or games shall also be deemed **"Publisher Properties"** hereunder. Publisher agrees that these Audience Network Terms will apply to any use by Publisher of the Audience Network Service (as defined below). As between FB and Publisher, FB retains exclusive ownership of the Audience Network Service (which, for clarity, excludes Publisher Properties).

21.    The FAN Terms contractually required Facebook to use "good faith efforts to provide" Shared with notice if Facebook discontinued Shared's use of the Instant Articles monetization feature.  Ex. 5.[4]

---

[4] Ex. 5 is a copy of the FAN Terms as they existed in May 2020.  Upon information and belief, the material provisions of the terms remained the same from 2018 through 2020 when Facebook suspended Shared's advertising account.

22.     Specifically, the FAN terms provide:

Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and ***FB will use good faith efforts to provide Publisher with notice of the same.***

*Id.* (emphasis added).

23.     In the context of the entire FAN terms, the "notice" would be understood to be advance notice.  Advance notice would allow a content creator, such as Shared, to shift its content creation strategy away from creating content tailored to Facebook's Instant Articles service.  For example, Shared integrated Instant Articles API into its content management system so that when a writer created a piece of content it would automatically publish on Instant Article. This strategy enhanced Shared's monetization opportunities.

24.     Tailoring content to succeed within the contours of Facebook's Instant Articles service involves different strategies than tailoring content that would succeed in other online advertising platforms, such as Google.  The creation of successful content requires investment ***before*** the content is posted.  After the fact notice that a party such as Shared has lost access to the Instant Articles monetization feature would result in a wasted investment.  As such, interpreting the contract as permitting after the fact notice would be unreasonable.

25.     Given that Shared invested heavily in content creation, the FAN term's notice provision was important to Shared at least because if Shared had notice that it would lose the monetization feature it could have shifted its content creation strategy away.  Had Shared received the contractually promised notice, Shared would have used the notice to shift its online marketing strategy by, for example, focusing on online advertising through Google Ads.

26.     In addition, the FAN Terms required Facebook to pay Shared the money Shared earned from the Instant Articles monetization feature "approximately 21 days following the end of the calendar month in which the transaction occurred . . . ."  Ex. 5.

27.     Based on its success in using Facebook advertising, Shared invested heavily in a custom built content management system ("CMS") that fully integrated with Facebook publishing and automatically published all articles on Shared.com to be compatible with the Instant Articles monetization feature.  Shared hired a Chief Technology Officer to oversee the development and implementation of the CMS.  That individual was recommended by a top executive at Facebook Canada, and he was brought in specifically to grow Shared's already substantial success operating with the Facebook advertising ecosystem.  Shared's investment in the CMS was in the seven-figure range.  Facebook in fact suggested that Shared open an office in Toronto in the same building as Facebook.

28.     Between 2016 and 2020, Shared spent approximately $3,500,000 developing systems and tools to succeed within the Facebook advertising ecosystem, on top of the millions it spent directly on Facebook advertisements.  Shared spent that money in reliance on Facebook living up to its contract and with the understanding that Facebook would act in good faith as a reasonable business partner.

29.     On April 24, 2018, Shared first lost ad monetization within the Instant Articles monetization feature of the Facebook Audience network, preventing Shared from generating revenue through that feature.  Despite the contractual requirement that Facebook use "good faith efforts" to provide Shared with notice if it discontinued Shared's use of the Instant Articles monetization feature, Facebook provided no advance notice.

30.     The surreptitious termination of Shared's ability to use the Instant Articles monetization feature by Facebook also delayed a payment that Facebook was required to make in

the amount of $90,885.63.  That payment was due "approximately 21 days following the end of

the calendar month in which the transaction occurred."  The $90,885.63 payment was for

transactions that occurred in April.  As such, the payment was due toward the tail end of May

2018.  But Shared did not receive the payment until September 21, 2018.  Without timely receipt

of the payment, and due to Facebook's ongoing breaches of its contract with Shared, Shared had

no choice but to lay off 18 people on July 13, 2018.

31.     When Facebook terminated Shared's ability to use the Instant Articles

monetization feature, Shared's content would still open within Facebook (as opposed to the user

being directed to Shared's own page).  Shared's content had been specifically created to allow

Facebook to place ads within the content.  When Facebook did not do so, Shared lost the

opportunity to place ads within the content that it would have had if the content were hosted on

Shared's own site.  This situation compounded the financial harm suffered by Shared.

32.     On August 10, 2018, a Facebook representative informed Shared that Facebook's

development team had found a "bug" that allegedly caused Shared to lose its ability to use the

Instant Articles monetization feature of the Facebook Audience Network.

33.     On August 18, 2018, Facebook restored Shared's ability to use the Instant Articles

monetization feature of Facebook's Audience Network.  During the time period between April

24, 2018, and August 18, 2018, Shared continued to create and distribute content, but without the

contracted for ability to monetize that content through the ad monetization feature of the Instant

Articles product.

34.     With Shared's access to the monetization feature restored, Facebook made the

$90,885.63 payment on September 19, 2018.

35.     On September 20, 2018, Shared again lost its ability to use the Instant Articles monetization feature, and again Facebook breached the contract by failing to provide advance notice to Shared.

36.     On October 2, 2018, Shared's ability to use the Instant Articles monetization feature was again restored without explanation, leading Shared to inquire with its Facebook representative as to whether it lost its ability to use Instant Articles monetization due to another "bug."

37.     On October 10, 2018, Shared heard from its Facebook representative, who assured Shared that there would be no further issues with Shared's use of the Instant Articles monetization feature while at the same time indicating that the representative would no longer be available to assist Shared in working with Facebook.

38.     Each time Shared lost its ability to use the Instant Articles monetization feature of the Facebook Audience Network, it suffered a significant revenue loss.  On November 12, 2018, Shared was forced to lay off an additional 10 people due to its latest Facebook-caused revenue loss.

39.     On November 29, 2018, Shared again lost its ability to use Instant Articles monetization, and once again Facebook failed to provide Shared with advance notice.

40.     Facebook never restored Shared's ability to use Instant Articles monetization, leading Shared to struggle to point of insolvency.

41.     By June 21, 2019, Shared was forced to give notice to 8 of its 10 remaining employees that they would be laid off in August 2019.

42.     Then on October 26, 2020, without any notice that it would happen and just as Shared was ready to turn a profit with a new business model, Facebook unpublished the Shared

Facebook Pages, suspended Shared's ability to advertise, disabled Mr. Nabigon's personal profile, and suspended the personal ad accounts of other Shared personnel.

43.     When Facebook unpublished the Shared Pages, it effectively gave Shared a death sentence within the Facebook ecosystem.  Shared lost its property right in its Facebook Pages with over 25 million followers that it had earned through its good faith investment in Facebook in reliance on Facebook's terms and conditions that governed the contract between Shared and Facebook.

44.     Facebook's repeated failure to provide Shared with any notice that it would discontinue Shared's use of Instant Articles monetization was not the only breach of contract committed by Facebook during Shared's business relationship with Facebook.  Facebook breached its contract with Shared by arbitrarily rejecting ads Shared had purchased through Facebook's self-serve advertising platform without providing the explanation of why they had been rejected and how the ads could be made compliant with Facebook's rules.

45.     Under its contract with Shared (and its other advertising customers), Facebook, was contractually required to explain the basis for its decision to reject an ad as allegedly not complying with its Advertising Policies along with an explanation sufficient for Shared to bring the allegedly non-compliant ad into compliance.  Until July 2021, Facebook's advertising contract provided:  "If your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one."  Ex. 4 at 2.

46.     Facebook changed its contract removing its express obligation to provide details that would allow an advertiser to edit an allegedly non-compliant ad to bring it into compliance. Rather than begin complying with its own contract and treating its customers fairly, Facebook attempted to contract out of its obligation to deal with its customers fairly.

47.     Over the course of its relationship with Facebook, Shared had numerous ads arbitrarily and incorrectly rejected without explanation.  Rather than provide Shared with the contractually mandated details that explain why such that Shared could have used that information to edit its ad, Facebook provided notices that were substantially similar to the following:



48.     Shared's significant investment in Facebook created significant value for Shared. That value was best encapsulated by Shared's Facebook pages with over 25,000,000 followers. Through its extensive efforts and significant investment, Shared had developed an intangible property interest in its collection of followers, to whom it could publish new content and whose interest in Shared's content provided an invaluable source for advertising that Shared could monetize.

49.     Facebook's Terms of Service provide that if a user, such as Shared, does not violate Facebook's terms, Facebook will not suspend of terminate the user's account.  Such a contractual policy makes sense as countless businesses rely on Facebook for their online presence.  If Facebook's contract allowed it to arbitrarily and without any reason terminate a business Page, such a clause would be unconscionable.  Specifically, Facebook's Terms of Service provide:

If we determine that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable your account.  We may also suspend or disable your account if you

repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.

Where we take such action we'll let you know and explain any options you have to request a review, unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; or where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

Ex. 11 at 7-8.

50.     Upon information and belief, Shared did not "clearly, seriously or repeatedly" breach any of Facebook's Terms, Policies, or Community Standards.  Facebook's decision to terminate Shared's ability to reach its followers within Facebook appears to have been completely arbitrary.

51.     Despite the significant investment Shared made into Facebook, Facebook has terminated Shared's ability to use Facebook, cratering the business and the $35,000,000 valuation it once enjoyed.  Of the eighty employees Shared had, only three remain.  Shared's plight has been covered by the media, including *Business Insider*.  Ex. 6.

52.     Within the Facebook ecosystem, a company like Shared's working capital is the amount of followers and likes it has.  The more likes and followers a company like Shared has on its Facebook Pages, the more likely it is that Facebook will promote that company's content within a user's news feed.  The more that company's content appears in a user's news feed, the more likely it is that the user will interact with the content.  The more the user interacts with the content, the more opportunities there are for that company to generate revenue within the Facebook ecosystem.  When Facebook suspends an account, such as Shared's, it halts momentum and user interaction.  When Facebook takes the step—often arbitrarily—to

permanently disable an account, the account owner is stripped of its effective capital in the form of followers and likes.  In the case of Shared, Facebook cut off the company from its approximately 25,000,000 followers, converting Shared's intangible property right and greatly harming the company.

53.     Facebook's breaches of contract, its misrepresentations, its unfair business practices, and its conversion of Shared's intangible property right in its collection of Facebook Pages with more than 25,000,000 followers have harmed Shared and left it with no choice but to pursue legal action against its once long-standing business partner, Facebook.

**FIRST CAUSE OF ACTION**

**Conversion**

54.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-53 as if fully set forth herein.

55.     Shared owned an intangible property right in its Facebook Pages, including in its collection of 25,000,000 online followers that it had grown, developed, and earned through its extensive investment in Facebook advertising and online publishing over many years.

56.     Shared had exclusive possession over its Facebook Pages and its 25,000,000 followers.  For example, Shared's business valuations accounted for the value of Shared's Facebook pages with the majority of that value coming in the form of Shared's followers.  If Shared had sold its business, the sale would have included Shared's Facebook Pages.  No other entity had a possessory right in Shared's Facebook Pages and its followers; that right was Shared's and Shared's alone.

57.     A Facebook Business Page is hosted within Facebook's Business Manager.  Ex. 9.  A Business Manager allows a business to designate various roles related to the Facebook business page.  One such role is the "admin" role, which has all of the privileges and rights that

1     would be expected of the business owner.  To effectuate a transfer of the business page from one

2     business to another, the "admin" would add another third party as an "admin," and that newly

3     named "admin" would then remove the previous "admin" (i.e., page owner) from the profile.

4     Only an "admin" can take the course of action described in this paragraph, which Facebook

5     clearly states in its policies.  *See* Ex. 10.

6         58.     The economics of social media platforms clearly place monetary value on a

7     page's followers.  Take for example, social media "influencers," who are paid to promote

8     products due to the number of followers or likes they have amassed.  The value there is the reach

9     of the influencer, and that reach is dictated by the number of followers an influencer has.

10        59.     On October 26, 2020, Facebook terminated Shared's ability to reach its

11    followers—and Shared's corresponding monetization abilities—by unpublishing the Shared

12    Pages within Facebook causing Shared to lose its ability to use its property right in the Facebook

13    Pages with the over 25,000,000 followers it had amassed.

14        60.     Facebook's knowing and deliberate decision and action in terminating Shared's

15    ability to reach its followers substantially interfered with Shared's intangible property right by

16    preventing Shared from accessing the collection of 25,000,000 followers it had amassed.  For

17    example, Shared could no longer access monetization opportunities that would have otherwise

18    been available to Shared from interacting with its 25,000,000 followers, causing Shared to lose

19    millions of dollars in advertising revenue.

20        61.     Shared did not consent to Facebook's interference with Shared's intangible

21    property right.

22        62.     Facebook's conduct in restricting access to Shared's Facebook Pages was a

23    substantial factor in the harm suffered by Shared.

24

25

**15 of 37**

63.     Without access to its 25,000,000 followers, Shared has been harmed in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**Violations of California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200, *et seq.***

64.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-53 as if fully set forth herein.

65.     Facebook violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, by engaging in fraudulent business acts or practices, engaging in unfair business acts or practices, engaging in acts prohibited by §§ 17500 through 17577.5, and disseminating unfair, deceptive, untrue, or misleading advertising as alleged previously and as further specified below.

66.     Until July 2021, Facebook's Advertising Policies advertised to potential consumers of the advertising services that Facebook will provide an explanation sufficient for the user to create a compliant ad during the ad review process.  Facebook's advertising in that regard was false.

67.     Facebook's false advertising was designed to induce the public, including Plaintiff, to purchase advertising services from Facebook.  Facebook's practices deceived the public into believing that when the public purchased advertising services from Facebook, the public would receive instruction as to how to bring an allegedly noncompliant ad into compliance with Facebook's policies.

68.     Facebook's deliberate decision to withhold the promised explanations during the ad review process is unscrupulous, and substantially injurious to business advertising purchasers, and thus constitutes an unfair practice under the UCL.

69.     As a business that makes nearly 100 percent of its profits and revenues from selling advertising services, Facebook understood that the ability to understand ad rejections was key to its consuming public.  As discussed above, momentum is key to any advertiser and Facebook knows—or at the very least should know—that a loss of advertising momentum can undermine its consuming public's investment in Facebook advertising.  Facebook's terms deceived the public into believing that Facebook would provide the promised information.  The consuming public—including Shared specifically—reasonably believed that Facebook would live up to its contract.  This is especially true because Facebook has specialized knowledge and understanding of the execution of a successful advertising campaign run on Facebook's powerful platform.

70.     Facebook intended to deceive the public into believing that Facebook would act as a reasonable business partner while at the same time knowing that it would rely on artificial intelligence that was incapable of allowing Facebook to meet its contractual obligations all so that Facebook could prioritize out-sized profits over the fair treatment of its advertising customers.

71.     Even if not fraudulent, Facebook's failure to comply with its advertising contract through its over-reliance on artificial intelligence is unfair under the California unfair competition law.  In other words, even if Facebook did not intentionally misrepresent that it would provide the contractually promised explanations and details concerning rejected ads, Facebook's conduct in using artificial intelligence to auto-reject ads that could not possibly give the promised details is still an unfair business practice, separate and apart from Facebook's fraudulent conduct.

72.     Facebook's practice was also contrary to legislatively declared public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal

Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), and California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200). The harm these practices caused to Plaintiff and the other businesses advertising on Facebook outweigh their utility, if any.

73.     Prior to deciding to advertise and/or continue advertising on Facebook, Plaintiff read and reasonably relied upon the Advertising Policies, including specifically the provisions explaining that when an ad is rejected, Facebook would provide an explanation sufficient to enable the user to create a compliant ad.  Plaintiff understood that the Advertising Policies constituted an affirmative representation and contractual commitment by Facebook to provide such explanations. Plaintiff understood that the Advertising Policies provided the terms under which the advertising services would be provided by Facebook.

74.     Facebook's failure to provide the promised explanations during the ad review process is unscrupulous and gave it an unfair competitive advantage, as it allowed Facebook to provide advertising services at a lower cost and, during the ad sales process, made those advertising services appear to be more valuable than they were.  Facebook could have devoted appropriate resources to supply the promised explanations but deliberately chose not to.  Instead, Facebook chose to maximize its profits, which grew to $29.1 billion in 2020.  Whatever utility Facebook may find in maximizing its profits is outweighed by the harm Facebook has caused to its advertising customers.

75.     *The New York Times* ("the Times") has reported that many advertising customers have had experiences strikingly similar to Shared's. Ex. 12. In a February 11, 2021 article, the Times reported that several businesses selling adaptive clothing had their ads suspended without the promised explanation, namely, a detailed explanation sufficient to create a compliant ad. *Id*. at 1-2. Rather, in the rejection notifications, the "word or part of the image that created the problem is not identified, meaning it is up to the company to effectively guess where the problem

lies." *Id*. at 7.   One business, being utterly unable to determine how to create compliant ads, started a remedial "petition" on change.org. *Id*. at 10.   After the petition received 800 signatures, Facebook lifted the restrictions on that business.  *Id*.

76.     Another business reported that it is "impossible" to create compliant ads without the help of an "outside media buying agency" who "could actually get a Facebook person on the phone."  *Id*. Yet another business reported that it had at least 200 ads rejected due to vague and unspecified "policy violations."  *Id*. at 11. That business owner was "exhausted by the constant attempts to reason with the void of an algorithm." *Id*.  The Times article quoted a professor as observing that "'[a]lgorithms solve the problem of efficiency at grand scale' — by detecting patterns and making assumptions — 'but in doing that one thing, they do all sorts of other things, too, like hurting small businesses.'"  *Id*. at 8.

77.     *Business Insider* reported that "hundreds of advertisers say they've had ads – and even entire accounts – banned despite not violating any policies."  Ex. 13 at 1. *Business Insider* reviewed messages and screenshots shared by these advertisers and reported that "[b]ecause Facebook doesn't tell advertisers which specific policy they violated when it disables their accounts, it's difficult to know what proportion of those bans were actually the result of an error by Facebook - or how many additional errors have gone unreported."  *Id*. at 2.

78.     *Business Insider* further reported that "a majority [of advertisers] said that Facebook typically provides little information about why it disabled their accounts while taking weeks to review their appeals, before ultimately admitting it banned them in error and restoring the accounts." *Id*. at 3.  "Even in some cases where Facebook took action against specific ads, screenshots and messages viewed by Business Insider showed that the ads appeared to have nothing to do with the policy they were flagged for ostensibly violating." *Id*.

79.     The *Business Insider* article reported that "Facebook's slow, opaque, and 'pay-to-play' customer support system has left them locked out for weeks as they try to get erroneous

bans resolved." *Id.* at 1.  These erroneous bans often cost the advertisers tens of thousands of dollars.  *Id.* at 2.

80.     Even ad agencies who specialize in Facebook advertising (and spend on the order of $1 million annually on the platform) are often unable to resolve the problem. *Id.* at 5. Those ad agencies themselves suffer substantial injury in that they are unable to build their businesses because Facebook suspends ads with "no explanation," "no real appeal process," "no proper customer support," and "no accountability."  *Id.*

81.     *Bloomberg'*s reporting echoes that of *The New York Times* and *Business Insider*. In a November 2020 article, *Bloomberg* reported on an owner of a make-up clinic who had her ads blocked for an unspecified "policy violation" at a time when, due to the COVID-19 pandemic, her business was relying (like so many others) on Facebook to drive sales and recover financially.  Ex. 14 at 1.  Another business reported that Facebook's unexplained rejection of her honey and beeswax ads nearly crippled her business.  *Id.*  *Bloomberg* reported that businesses rely on Facebook as a "lifeline during the pandemic." *Id.* at 3.

82.     The damage inflicted by Facebook's seemingly arbitrary ad rejections is often "hard to quantify."  *Id.* at 4.  Advertisers are often unable to determine how long the ads were banned or which products were being advertised in their place. *Id.*  Moreover, "[e]ven if an ad account gets restored, businesses lose crucial momentum.  Facebook's advertising algorithm takes a couple of weeks to figure out which users may be interested in an ad, to refine the targeting," which means that the re-started ad campaign will not be as effective.  *Id.* at 3. Measuring the actual revenue lost by a business advertiser is thus often difficult or impossible to calculate.

83.     Facebook's explanation-free ad rejections are causing the loss of many jobs.  For instance, digital marketing firm 4AM Media "had to cut 12 jobs partly because of Facebook ad account bans, which have lasted almost six months." *Id.* at 4.  "'They give you zero feedback,'

[the founder] added. 'The only people who are OK are massive spenders who get a Facebook rep that can escalate issues and find out what's wrong.'" *Id*. Even with Shared's massive spending, Shared was unable to survive Facebook's arbitrary ad rejection process.  In another example, the solar roof company Human SOLR reported that due to its inability to navigate Facebook ad rejections its "business is at a complete standstill." *Id*.

84.     *Bloomberg* also corroborated the need to have an "in" at Facebook in order to have advertising rejections reliably resolved.  "GFP Delivered, a Chicago-based produce company advertising a way for people to avoid the grocery store during Covid-19, had its Facebook ads shut down for two months without clear explanation, according to owner George Fourkas. He said he was able to fix the problem only after reaching out to old college friends who work at Facebook." *Id*.  Another business owner reported that her ad rejections were lifted only after she sent a private Twitter message to Facebook's director of ad products.  *Id*. at 5.

85.     In a follow-up article, *Bloomberg* reported that digital marketers or ad agencies (like plaintiff Shared) are also suffering "immense" and unquantifiable injury because they are simply not able to do their jobs. Ex. 15.  The article offered multiple examples, one of which was a digital marketer, Chris Raines, who nearly went out of business due to Facebook's failure to provide the promised explanations for ad rejections.  *Id*. at 1.

86.     Further, many businesses hire experts like Raines to manage their ads, meaning ads from the account are essentially unsupervised if their hired expert is locked out of an account without explanation. *Id*. at 2.  That happens frequently even to digital marketing experts, according to *Bloomberg*'s reporting. *Id*. at 2-3.  The digital marketing companies are understandably frustrated at Facebook's apparent "lack of accountability" and the absence of a real appeal process, with one digital marketer quoted by *Bloomberg* calling the situation "preposterous."  *Id*. at 3.

87.     *Bloomberg*'s follow-on article reiterated the theme that ad account access is often restored only with back-channel requests. *Id.* at 3-4. "Raines and [another digital marketer] eventually gained access to their accounts again, but don't think the issue was fixed through Facebook's proper channels. Instead, they were lucky enough to find a Facebook employee on LinkedIn willing to escalate their issue internally." *Id.* at 4.

88.     Plaintiff has standing to bring these claims under the UCL because it was injured and lost money or property, including but not limited to money paid toward Facebook advertisements, as a result of Facebook's fraudulent and unfair business practices.  Among other things, Plaintiff would not have bought as much in advertising services if Facebook had disclosed that it would not provide explanations during the ad review process and that ad campaigns or ad privileges could be revoked or suspended at any time without explanation.  If Facebook had disclosed this, Shared would not have invested millions of dollars towards Facebook advertising and related tools and/or would have purchased fewer advertisements.

89.     Due to Facebook's violation of the UCL, Shared failed to receive the benefit of the contract, including the bargained-for benefit in exchange for their investments of months or years of time and resources building online Facebook presences, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers. Shared paid Facebook substantial sums of money and devoted substantial time building an online Facebook presence, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers.  Plaintiff would not have done so or would have done so to a much lesser extent, but for Facebook's misrepresentations.

## THIRD CAUSE OF ACTION

### Breach of Contract

90.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-53 as if fully set forth herein.

91.     Facebook breached its contract with Shared in at least four separate ways.

92.     First, Facebook breached its contract with Shared by failing to use good faith efforts to provide Shared with advance notice if Facebook disabled Shared's ability to use the ad monetization feature of Facebook's Instant Articles monetization feature.

93.     The FAN Terms required Facebook to use "good faith efforts to provide" Shared with advance notice if Facebook discontinued Shared's use of Instant Articles monetization.

94.     Specifically, the FAN terms provide:

Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and ***FB will use good faith efforts to provide Publisher with notice of the same.***

95.     On April 24, 2018, Shared first lost ad monetization within the Instant Articles feature of the Facebook Audience Network.  When that happened, Shared was no longer able to generate revenue through the Instant Articles feature.  Facebook did not provide Shared with any notice that it would be discontinuing Shared's use of Instant Articles monetization.  Facebook did not restore the monetization feature until September 2018.  Thereafter Facebook disabled ad monetization on at least two separate occasions—each time without any advance notice to Shared.

96.     Facebook's breach of its contract by failing to provide Shared with advance notice before suspending Shared's access to the monetization feature of Instant Articles caused direct harm to Shared in a number of ways.

97.     For example, Shared invested heavily in creating content specifically tailored to succeed within Facebook's ecosystem.  Shared spent $3,500,000 creating a content management system that was optimized to push every piece of content Shared created to Facebook instant articles.  Shared would not have made such an investment if understood that Facebook would

breach the contract and not provide advance notice to Shared before disabling Shared's access to the monetization feature of Instant Articles.  Facebook's breach of its contract by suspending Shared's access to the monetization feature of Instant Articles without advance notice directly harmed Shared by undermining Shared's investment in Shared's Facebook-tailored CMS.  Had Facebook provided Shared with advance notice, Shared could have redesigned its CMS to focus on other sources of online advertising revenue.

98.     As another example, Shared paid content providers to create content that would attract views and therefore be promoted in a user's news feed.  When Facebook breached its contract by failing to provide Shared with advance notice before suspending Shared's access to the monetization feature of Instant Articles, Facebook caused direct harm to Shared because Shared could no longer recoup its investment in content by generating advertising revenue through Instant Articles and its monetization feature.  Had Facebook provided Shared with advance notice, Shared could have diverted its funds to investment in different content or no content at all.

99.     Each time Facebook improperly suspended Shared's access to the monetization feature of Instant Articles, Shared lost key momentum.  Had Facebook provided Shared with advance notice that Facebook would suspend Shared's access to the monetization feature, Shared could have worked with Facebook to address alleged issues without Shared losing its momentum within the Facebook ecosystem.  Momentum is of particular importance in Facebook, which is a likes and views driven platform, which favors content that draws more attention (presumably because Facebook's entire business model turns on drawing user attention so that Facebook can sell advertisements).  By failing to provide Shared with advance notice, Facebook directly harmed Shared by halting Shared's momentum with no ability for Shared to course correct to the extent required by Facebook.

100.    Second, Facebook breached its contract with Shared when Facebook failed to comply with its own self-service advertising policies in place at the relevant time.

101.    Facebook was obligated to provide businesses advertising, such as Shared, on Facebook an explanation of why an ad was being rejected or advertising privileges were being suspended or revoked.  For example, the Advertising Policies provided:

> If your ad doesn't get approved, we'll send you an email with details that explain why.[]
> Using the information in your disapproval email, you can edit your ad and create a compliant one.

Ex. 4 at 2.

102.    Facebook breached its contractual obligation to Shared, by rejecting ads without information that could be used to edit the ad and create a compliant one.  Instead, Facebook provides a circular reference to Facebook's advertising policies that the advertiser attempted to comply with in the first place.  Those policies include 14 broadly worded categories of "Restricted Content" in addition to various restrictions on "video ads," "targeting," "positioning," and "lead ads," spanning pages.  Those policies also include a catch-all provision stating:  "We reserve the right to reject, approve or remove any ad for any reason . . . ."

103.    Facebook could have devoted appropriate resources (including human employees or contractors) to help supply the promised explanations but deliberately chose not to.  Instead, Facebook chose to maximize its profits, which swelled to $29.1 billion in 2020.

104.    As a result, Shared purchased advertising services they would not otherwise have purchased and failed to receive the benefit of their bargain.

105.    Facebook's failure to provide information that would allow Shared to edit allegedly noncompliant ads caused direct harm to Shared.  On numerous—likely hundreds—of occasions, Shared would run identical ads on the same day, and Facebook would approve some

portion of the identical ads and disapprove some other portion of the ads.  Facebook never

provided the promised details—presumably because it was unable to due to its over-reliance on

an artificial intelligence-based review process.  Shared would generate advertising revenue on

the ads Facebook did approve, but would not be able to generate revenue on the identical ads that

Facebook disapproved without providing the contractually promised details.

106.     As another example, Shared would often run ads successfully that had been

approved by Facebook, building momentum with a particular ad.  For example, ads would be run

for a set period of time, and at the conclusion of the set period, Shared would decide whether re-

run the ad.  If an ad was generating revenue and building momentum, Shared would re-run the

ad.  In advertising momentum is key, and that is especially true within the Facebook platform.

Often, when Shared would attempt to re-run an identical that Facebook had approved and

profited from, Facebook would reject the same ad with no explanation or details that would

allow Shared to edit the ad.  Other times, Facebook would disable ads during a continuously

running period.  In either scenario, Shared would lose critical momentum, which would have

been entirely expected by Facebook, which knows online advertising better than anyone.  That

loss of momentum caused Shared substantial financial harm.

107.     Third, Facebook failed to make at least one payment to Shared in connection with

the Instant Articles monetization feature on the contractually required payment schedule.

108.     The FAN Terms required Facebook to pay Shared the money Shared earned from

the Instant Articles monetization feature "approximately 21 days following the end of the

calendar month in which the transaction occurred . . . ."

109.     In one such situation, Shared was owed $90,885.63 by the end of May at the

latest.  Facebook did not make the payment until September 2018.  Without important operating

capital, Shared had no choice but to lay off 18 people on July 13, 2018.

110.     Fourth, Facebook breached its contract with Shared by suspending the Shared's business manager account and the Shared Pages despite the fact that Shared, upon information and belief, did not "clearly, seriously, or repeatedly" breach Facebook's Terms, Conditions, and Policies.

111.     When Facebook breached its contract by arbitrarily suspending Shared's business manager account and the Shared Pages, Shared lost access to its 25,000,000 followers leading Shared to lose significant revenue generating monetization opportunities.  Had Facebook not breached its contract, Shared would have expected to generate advertising revenue.  As an advertising company, Facebook should have expected that arbitrarily suspending a business page would directly cause Shared to lose revenue generating monetization opportunities.

112.     Facebook's breach of contract also deprived Shared of the benefit of its bargain. Shared invested heavily in Facebook with the understanding that Facebook would comply with its contract and not arbitrarily suspend Shared's access to its 25,000,000 followers.

113.     To the extent Facebook alleges that the types of damages sought by Shared are not recoverable due to an attempted limitation on liability, that limitation is unconscionable.

114.     Shared will prove the amount of harm Facebook caused Shared at trial.

## FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

115.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-53 as if fully set forth herein.

116.     Plaintiff met all or substantially all of its contractual obligations, including submitting its advertising for Facebook's approval and paying for Facebook's advertising services.

117. Facebook's FAN Terms required Facebook to use "good faith efforts to provide" notice if it disabled the ad monetization feature of the Instant Articles monetization product. Reasonably interpreted, such notice is advance notice. But to the extent Facebook purports to read the contract as permitting after-the-fact notice, such a reading would violate the implied covenant of good faith and fair dealing operates to require that notice to have been advance notice.

118. Implicit in the FAN Terms' notice provision is a duty for Facebook to treat its customers fairly by providing prior notice and opportunity to cure before removing Shared from the Facebook ecosystem in which Shared invested so substantially to Facebook's pecuniary benefit.

119. More generally, Facebook's contracts with Shared should be interpreted to imply a duty on the part of Facebook to provide notice and opportunity to cure before it completely terminated Shared's access to Facebook, resulting in Facebook Pages with 25,000,000 followers earned through millions of dollars of investment and years of hard work.

120. Under California law, Facebook was required to perform its contractual obligations in good faith and to avoid any acts or material omissions which unfairly interfere with the right of any other party to receive the benefits of the contract.

121. Had Facebook met its duty of good faith and fair dealing, it further would have provided Shared with a reasonable opportunity to remediate any perceived problems and thereby avoid suspension or revocation of its accounts.

122. Due to Facebook's breach of its duty of good faith and fair dealing, Shared failed to receive the benefit of its contract with Facebook, including the bargained-for benefit in exchange for their investments of years of time and resources building an online Facebook

presence, learning Facebook's systems, developing Facebook ad campaigns and acquiring Facebook followers.

## FIFTH CAUSE OF ACTION

### Intentional Misrepresentation

### (Cal. Civ. Code §1710(1))

123.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-53 as if fully set forth herein.

124.    Facebook intentionally misrepresented at least two key items during the course of its business relationship with Shared.

125.    First, Facebook intentionally misrepresented that it would use good faith efforts to provide Shared with notice if it suspended Shared's ability to use the ad monetization feature of the Instant Articles monetization service.

126.    The FAN Terms included the following representation: "Publisher will participate in the Audience Network Service during the Term in accordance with these Audience Network Terms. Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and *FB will use good faith efforts to provide Publisher with notice of the same*[.]" Ex. 5 at 1 (emphasis added). By including this in the FAN terms, Facebook represented to Shared that it was true.

127.    Upon information and belief, Facebook knew that representation was false when Facebook made it. At the very least, Facebook made the representation recklessly and without regard for its truth.

128.    Specifically, Facebook knew that it would not use good faith efforts to provide advance notice to Shared before suspending Shared's advertising privileges. For example, Facebook knew that it would rely heavily on artificial intelligence to review its customer's

compliance with Facebook policies and that such artificial intelligence often made mistakes when disabling accounts.  Facebook knew that it would not be able to provide advance notice given its preference to maximize profits by using artificial intelligence instead of human review.

129.    Facebook never intended to use the promised good faith efforts to provide the promised notice.  Instead, Facebook included the term in its contract to give the illusion of reasonableness knowing full well that its customers would have little choice but to stay with Facebook when Facebook breached the contract due to Facebook's unprecedented reach and power.

130.    At least because Facebook included the provision in the FAN terms, it intended that Shared would rely on it.

131.    Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of the Instant Articles monetization feature, which use generated profits for Facebook.  For example, Shared invested in content creators with the understanding that if Facebook would discontinue Shared's use of the Instant Articles monetization feature, Facebook would provide Shared with notice of the same.

132.    Shared was harmed by Facebook's intentional misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.  Had Shared received timely notice from Facebook that it would discontinue its access to the ad monetization feature, Shared could have, for example, shifted its content strategy away from content specifically designed to draw attention within the Facebook ecosystem.

133.    Second, Facebook falsely represented that during the ad review process, it would provide details to allow Shared to edit ads that had been rejected to bring them into compliance (to the extent they were not already).

134.     More specifically, Facebook's self-serve advertising policies included the following representation up until July 2021: "If your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one." Ex. 4. By including that representation in its advertising policies, Facebook represented to Shared that it was true.

135.     Facebook knew that representation was false when Facebook made it.  In the alternative, Facebook made the representation recklessly and without regard for its truth.

136.     Facebook knew it would not be able to provide the promised details.  In fact, Facebook represented to the Northern District of California that it would be "wildly infeasible" to provide the details that they were required to provide by contract.  *See* Civ. No. 4:21-cv-01495, Dkt. 43 at 12.  Facebook knew that's its over-reliance on artificial intelligence would make complying with its own contract impossible.  Indeed, Facebook changed its terms in July 2021 to remove the subject promise when its failure to comply with the terms was challenged by an advertiser.

137.     Facebook intended to defraud Shared by including the subject promise to provide the required details because Facebook knew it had no intention to comply with the term. Facebook knows that it must make at least superficial efforts to treat its customers fairly for at least purposes of avoiding even more bad press than it regularly receives.  Facebook also knows that due to its monopoly power, its customers have little choice but to accept the terms of Facebook's adhesion contract and little choice but to advertise on Facebook due to the unprecedented reach and power of Facebook's platform.  Facebook included the term in its contract to give the illusion of reasonableness with no intent to actually comply with the term. Indeed, Facebook has admitted that compliance with the letter of its contract would be "wildly infeasible."

138.    At least because Facebook included the provision in its self-serve advertising terms, it intended that Shared would rely on it.

139.    Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of Facebook's self serve advertising service.

140.    Shared was harmed by Facebook's intentional misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.

141.    For example, due to Shared's reliance on Facebook's intentional misrepresentation that it would provide the promised notice before suspending Shared's access to the monetization feature of instant articles, Shared invested millions of dollars in Facebook advertising and related tools with the understanding that Facebook would provide with advance notice before terminating Shared's access to the monetization feature.

142.    Plaintiff seeks an award of compensatory damages, including specifically lost profits and punitive damages.

**SIXTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Cal. Civ. Code §1710(2))**

143.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 8-53 as if fully set forth herein.[5]

144.    The FAN Terms included the following representation:  "Publisher will participate in the Audience Network Service during the Term in accordance with these Audience Network Terms. Publisher (a) understands and agrees that FB may change, withdraw, or discontinue the Audience Network Service in its sole discretion and *FB will use good faith*

---

[5] Shared pleads this sixth cause of action as an alternative to its fifth cause of action.

*efforts to provide Publisher with notice of the same*[.]" Ex. 5 at 1 (emphasis added).  By

including this in FAN terms, Facebook represented to Shared that it was true.

145.     Upon information and belief, even if Facebook honestly believed that

representation was true, Facebook had no reasonable grounds for believing that it would actually

treat its customers fairly and use good faith efforts to provide notice that it would discontinue

access to the Audience Network service.

146.     Specifically, Facebook had no reasonable grounds on which it could form a belief

that it would use good faith efforts to provide advance notice to Shared before suspending

Shared's advertising privileges.  For example, Facebook knew that it would rely heavily on

artificial intelligence to review its customer's compliance with Facebook policies and that such

artificial intelligence often made mistakes when disabling accounts.  As such, Facebook had no

reason to believe that it would be able to provide advance notice given its preference to

maximize profits by using artificial intelligence instead of human review.

147.     Facebook never intended to use the promised good faith efforts to provide the

promised notice.  Instead, Facebook included the term in its contract to give the illusion of

reasonableness knowing full well that its customers would have little choice but to stay with

Facebook when Facebook breached the contract due to Facebook's unprecedented reach and

power.

148.     At least because Facebook included the provision in the FAN terms, it intended

that Shared would rely on it.

149.     Shared reasonably relied on that term in connection with its decision to invest

millions of dollars in connection with its use of the Instant Articles monetization feature, which

use generated profits for Facebook.  For example, Shared invested in content creators with the

understanding that if Facebook would discontinue Shared's use of the Instant Articles monetization feature, Facebook would provide Shared with notice of the same.

150.    Shared was harmed by Facebook's negligent misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.

151.    Facebook's self-serve advertising policies included the following representation up until July 2021: "If your ad doesn't get approved, we'll send you an email with details that explain why. Using the information in your disapproval email, you can edit your ad and create a compliant one."

152.    By including the representation set forth in the immediately preceding paragraph in its advertising policies, Facebook represented to Shared that it was true.

153.    Facebook represented that during the ad review process, it would provide details to allow Shared to edit ads that had been rejected to bring them into compliance (to the extent they were not already).  Facebook also falsely represented at least through its conduct that it would provide advance notice of and explanation for any suspension or revocation of advertising privileges.

154.    Upon information and belief, even if Facebook honestly believed that representation was true, Facebook had no reasonable grounds for believing that it would invest the resources needed to allow Facebook to comply with the terms of its representation.

155.    Facebook had no reasonable basis upon which it believed that it would be able to provide the promised details.  In fact, Facebook represented to the Northern District of California that it would be "wildly infeasible" to provide the details that they were required to provide by contract.  *See* Civ. No. 4:21-cv-01495, Dkt. 43 at 12.  Facebook knew—or at the very least should have known—that its over-reliance on artificial intelligence would make complying with

its own contract impossible.  Indeed, in July 2021 Facebook changed its terms to remove the subject promise when its failure to comply with the terms was challenged by an advertiser.

156.    Facebook intended to defraud Shared by including the subject promise to provide the required details because Facebook knew it had no intention to comply with the term. Facebook knows that it must make at least superficial efforts to treat its customers fairly for at least purposes of avoiding even more bad press than it regularly receives.  Facebook also knows that due to its monopoly power, its customers have little choice but to accept the terms of Facebook's adhesion contract and little choice but to advertise on Facebook due to the unprecedented reach and power of Facebook's platform.  Facebook included the term in its contract to give the illusion of reasonableness with no intent to actually comply with the term. Indeed, Facebook has admitted that compliance with the letter of its contract would be "wildly infeasible."

157.    At least because Facebook included the provision in its self-serve advertising terms, it intended that Shared would rely on it.

158.    Shared reasonably relied on that term in connection with its decision to invest millions of dollars in connection with its use of Facebook's self serve advertising service.

159.    Shared was harmed by Facebook's negligent misrepresentation, and Shared's reliance on Facebook's misrepresentation was a substantial factor in the harm suffered by Shared.

160.    Plaintiff seeks an award of compensatory damages, including specifically lost profits and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in its favor:

A.      On Shared's First Cause of Action for Conversion:  damages in an amount to be proven at trial;

B.      On Shared's Second Cause of Action for violation of California's Unfair Competition law:  compensatory damages in an amount to be proven at trial;

C.      On Shared's Third Cause of Action for Breach of Contract:  compensatory damages in an amount to be proven at trial;

D.      On Shared's Fourth Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing:  compensatory damages in an amount to be proven at trial;

E.      On Shared's Fifth Cause of Action for Intentional Misrepresentation: compensatory damages, including specifically lost profits, in an amount to be proven at trial;

F.      On Shared's Sixth Cause of Action for Negligent Misrepresentation: compensatory damages in an amount to be proven at trial;

G.      Disgorgement of the ill-gotten gains derived by Facebook from its misconduct;

H.      Statutory damages as permitted by law;

I.      Punitive and exemplary damages;

J.      Pre-judgment interest at the maximum rate permitted by applicable law;

K.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

L.      Such other relief as this Court deems just and proper.

1

**JURY TRIAL DEMAND**

2              Plaintiff hereby requests a jury trial for all issues so triable.

3

4    Dated:   July 8, 2022              Respectfully submitted,

5

6                                          */s/ W. Cook Alciati*

7

8                                          Seth W. Wiener, California State Bar No. 203747
                                           Law Offices of Seth W. Wiener
9                                          609 Karina Court
                                           San Ramon, CA 94582
10                                         Telephone: (925) 487-5607
                                           Email: seth@sethwienerlaw.com

11
                                           W. Cook Alciati (admitted *pro hac vice*)
12                                         Gardella Grace P.A.
                                           80 M Street SE, 1st Floor
13                                         Washington D.C., 20003
                                           Telephone: (703) 721-8379
14                                         Email: calciati@gardellagrace.com

15

16

17

18

19

20

21

22

23

24

25