UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHARED.COM,

    Plaintiff,

v.

META PLATFORMS, INC.,

    Defendant.

Case No. 22-cv-02366-RS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# I. INTRODUCTION

Plaintiff Shared.com ("Shared") is an online content creator that was, for many years, deeply engaged in the Facebook advertising ecosystem. This suit arose following a series of alleged incidents that effectively barred Shared from using, advertising on, and monetizing from the social media platform. The operative First Amended Complaint ("FAC") avers breach of contract, misrepresentation, and several other acts of misconduct by Defendant Meta Platforms, Inc. ("Meta"). Meta now moves to dismiss the FAC for failure to state a claim.

The motion is granted in part and denied in part. Some of Plaintiff's claims are barred by section 230(c)(1) of the Communications Decency Act. The remaining claims, however, have been adequately pleaded.

# II. BACKGROUND[1]

---

[1] As this Court must "accept all factual allegations in the complaint as true" when evaluating a Rule 12(b)(6) motion to dismiss, *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005), all facts

Shared is a partnership based out of Ontario, Canada that "creates and publishes original, timely, and entertaining [online] content." Dkt. 21 ¶ 9. In addition to its own website, Plaintiff also operated a series of Facebook pages from 2006 to 2020. During this period, Shared avers that its pages amassed approximately 25 million Facebook followers, helped in part by its substantial engagement with Facebook's "advertising ecosystem." This engagement occurred in two ways. First, Shared directly purchased "self-serve ads," which helped drive traffic to Shared.com and Shared's Facebook pages. Second, Shared participated in a monetization program called "Instant Articles," in which articles from Shared.com would be embedded into and operate within the Facebook news feed; Facebook would then embed ads from other businesses into those articles and give Shared a portion of the ad revenue. Shared "invested heavily in content creation" and retained personnel and software specifically to help it maximize its impact on the social media platform. *Id.* ¶ 19.

Friction between Shared and Facebook began in 2018. Shared states that it lost access to Instant Articles on at least three occasions between April and November of that year. Importantly, Shared received no advance notice that it would lose access. This was contrary to Shared's averred understanding of the Facebook Audience Network Terms ("the FAN Terms"), which provide that "[Facebook] may change, withdraw, or discontinue [access to Instant Articles] in its sole discretion and [Facebook] will use good faith efforts to provide Publisher with notice of the same." *Id.* ¶ 22; *accord* Dkt. 21-5. Shared asserts that "notice," as provided in the FAN Terms, obliges Facebook to provide *advance* notice of a forthcoming loss of access, rather than after-the-fact notice.

During this same timeframe, Facebook also failed to make a timely payment from Instant Articles ad revenue. Another clause in the FAN Terms ("the FAN payment term") provides that Facebook would forward money earned through Instant Articles "approximately 21 days following the end of the calendar month in which the transaction occurred." Dkt. 21 ¶ 26; *accord*

in this section are taken from the FAC, unless otherwise noted.

ORDER ON MOTION TO DISMISS
CASE NO. 22-cv-02366-RS

2

1    Dkt. 21-5. Facebook delayed paying Shared its portion of April 2018 ad revenue until September
2    2018, roughly four months beyond the timeframe noted in the FAN payment term. This delay led
3    to a critical shortage in Shared's operating capital, ultimately resulting in its decision to lay off
4    eighteen employees.

5    Meanwhile, all was not well with Shared's self-serve ad buys. Shared notes that, "[o]ver
6    the course of its relationship with Facebook, Shared had numerous ads arbitrarily and incorrectly
7    rejected without explanation." Dkt. 21 ¶ 47. Facebook's Advertising Policies, which governed the
8    self-serve ad program, had provided that if an ad was rejected, Facebook would send the publisher
9    "an email with details that explain why. Using the information in [the] disapproval email, you can
10   edit your ad and create a compliant one." *Id.* ¶ 45; *accord* Dkt. 21-4, at 2. Shared expected to
11   receive specific explanations when its ads were rejected, but each time it instead received a
12   "circular" explanation simply stating that the ad had been rejected for failing to comply with the
13   Advertising Policies. Dkt. 21 ¶ 102.

14   All of these tensions were brought to a head in October 2020 when Facebook "unpublished
15   the Shared Facebook pages, suspended Shared's ability to advertise," and disabled Shared's ad
16   accounts as well as the personal Facebook profiles of several Shared employees. *Id.* ¶ 42. While
17   the Facebook Terms of Service stated that accounts could be suspended only after "clearly,
18   seriously or repeatedly" breaching Facebook's policies, *id.* ¶ 49, Shared states that, to its
19   knowledge, it had not violated any such policies. These actions "effectively gave Shared a death
20   sentence within the Facebook system," resulting in its business and its multimillion-dollar
21   valuation "cratering." *Id.* ¶¶ 43, 51.

22   Shared sued Meta, Facebook's parent company, in July 2022. The FAC raises six claims
23   for relief, some of which have multiple factual bases. First, Shared avers that Meta committed
24   conversion (Claim 1), breach of contract (Claim 3), and breach of the implied covenant of good
25   faith and fair dealing (Claim 4) in suspending access to Shared's Facebook pages, contrary to the
26   Facebook Terms of Service. Second, Shared avers that Meta committed breach of contract (Claim
27   3), breach of the implied covenant of good faith and fair dealing (Claim 4), and intentional

28                                                                          ORDER ON MOTION TO DISMISS
                                                                            CASE NO. 22-cv-02366-RS

3

misrepresentation (Claim 5) or negligent misrepresentation (Claim 6) for failing to provide advance notice of suspension from Instant Articles, contrary to the FAN Terms. Third, Shared avers that Meta committed breach of contract (Claim 3), intentional misrepresentation (Claim 5) or negligent misrepresentation (Claim 6), and violated California's Unfair Competition Law ("UCL") (Claim 2), *see* Cal. Bus. & Prof. Cod § 17200, for failing to provide sufficient details regarding ad rejections in violation of the Advertising Policies. Fourth, Shared avers that Meta committed breach of contract (Claim 3) for failing to deliver the April 2018 payment on time in violation of the FAN payment term. Meta now moves to dismiss the FAC in its entirety.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

For actions sounding in fraud, the complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Such averments "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged," such that they are "specific enough to give defendants notice of the particular misconduct." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (first quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); and then quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). Knowledge may be pleaded generally under Rule 9(b), but the complaint "must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably

ORDER ON MOTION TO DISMISS
CASE NO. 22-cv-02366-RS
4

be inferred." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018).

## IV. ANALYSIS

To survive Defendants' motion to dismiss, each of Plaintiff's claims must overcome three hurdles: first, they must not be barred by section 230(c)(1) of the Communications Decency Act; second, they must not be barred by the Limits on Liability within the Facebook Terms of Service; and third, they must be sufficiently pled. After reviewing the FAC, not every claim can overcome all three, so each hurdle is addressed in turn.

### A. Section 230(c)(1) Immunity

Congress passed the Communications Decency Act in an effort to create and promote a vibrant digital communications landscape. Among other things, section 230(c)(1) of the Act generally exempts "information content providers" from liability for information provided by third parties. *See, e.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099–100 (9th Cir. 2009). The section states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). While this immunity is broad, it is not absolute. As the Ninth Circuit clarified in *Barnes v. Yahoo!, Inc.*, the relevant inquiry is not how plaintiffs style their claims for relief, but rather "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" 570 F.3d at 1102. If the plaintiff alleges that liability arises from the defendant's "manifest intention to be legally obligated to do something," rather than from the defendant's "status or conduct as a 'publisher or speaker,'" section 230(c)(1) does not apply. *Id.* at 1107; *see In re Zoom Video Commc'ns. Inc. Privacy Litigation*, 525 F. Supp. 3d 1017, 1034 (N.D. Cal. 2021).

Defendant argues that all of Plaintiff's claims are barred by section 230(c)(1). It asserts, and Plaintiff does not contest, that Meta is a "provider . . . of an interactive computer service" under the Act's definition, and that the relevant information at issue was "provided by another information content provider." 47 U.S.C. § 230(c)(1); *see* Dkt. 24, at 22. Defendant further argues

ORDER ON MOTION TO DISMISS
CASE NO. 22-cv-02366-RS

5

1  that each of Plaintiff's claims seek to treat Meta as a "publisher or speaker," and that the suit must
2  therefore fail in its entirety.
3       Defendant is only partially correct. Plaintiff raises three claims involving Defendant's
4  decision to suspend Plaintiff's access to its Facebook accounts and thus "terminate [its] ability to
5  reach its followers": one for conversion, one for breach of contract, and one for breach of the
6  implied covenant of good faith and fair dealing. *See* Dkt. 21, ¶¶ 54–63, 110–12, 119. Shared
7  claims that, contrary to the Facebook Terms of Service, Defendant suspended Shared's access to
8  its Facebook pages without first determining whether it had "clearly, seriously or repeatedly
9  breached [Facebook's] Terms or Policies." At bottom, these claims seek to hold Defendant liable
10 for its decision to remove third-party content from Facebook. This is a quintessential editorial
11 decision of the type that is "perforce immune under section 230." *Barnes*, 570 F.3d at 1102
12 (quoting *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1170–
13 71 (9th Cir. 2008) (en banc)). Ninth Circuit courts have reached this conclusion on numerous
14 occasions. *See, e.g.*, *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021); *Atkinson*
15 *v. Facebook Inc.*, 20-cv-05546-RS (N.D. Cal. Dec. 7, 2020); *Fed. Agency of News LLC v.*
16 *Facebook, Inc.*, 395 F. Supp. 3d 1295, 1306–07 (N.D. Cal. 2019). To the extent Facebook's Terms
17 of Service outline a set of criteria for suspending accounts (i.e., when accounts have "clearly,
18 seriously, or repeatedly" breached Facebook's policies), this simply restates Meta's ability to
19 exercise editorial discretion. Such a restatement does not, thereby, waive Defendant's section
20 230(c)(1) immunity. *See King*, 572 F. Supp. 3d at 795. Allowing Plaintiff to reframe the harm as
21 one of lost data, rather than suspended access, would simply authorize a convenient shortcut
22 through section 230's robust liability limitations by way of clever pleading. Surely this cannot be
23 what Congress would have intended. As such, these claims must be dismissed.
24      The remaining claims, however, do not seek to treat Defendant as a publisher or speaker.
25 They arise instead out of promises that Plaintiff argues Defendant made to its advertising partners.
26 With respect to the FAN Terms, Plaintiff's claims are rooted in Defendant's averred violation of
27 its promise to provide "notice." Plaintiff similarly seeks to hold Defendant liable for its averred

United States District Court
Northern District of California

violation of its promise to provide "details that explain why" Plaintiff's ads were rejected. In both cases, Plaintiff does not question Defendant's right or ability to limit access to the Facebook ad platform or to remove the ads; rather, Plaintiff objects to what it argues were deficiencies in the procedure described in Facebook's contracts. *Cf. id.* ("That Facebook has the editorial discretion to post or remove content has little do to with the implied promise to explain why content was removed."). Additionally, Plaintiff's breach of contract claim involving the FAN payment term clearly has nothing to do with Facebook's editorial capabilities, but rather involves its obligations to pay ad partners in a timely fashion. These claims, therefore, are not subject to section 230(c)(1) immunity.

### B. Facebook's Limits on Liability

Defendant next argues that many of Plaintiff's claims for damages are barred under the Limits on Liability ("the limitations provision") included in Facebook's Terms of Service. In relevant part, the Terms state the following:

> [Facebook's] liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Facebook Products, even if we have been advised of the possibility of such damages.

Dkt. 21, Ex. 11 § 3. Courts have generally enforced such limitations provisions, so long as they are not unconscionable.[2] *See, e.g.*, *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.,* 147 Cal. Rptr. 3d 634, 641–42 (Ct. App. 2012). However, as Plaintiff correctly observes, California law renders limitations provisions unenforceable against claims for fraud or willful injury. *See* Cal. Civ. Code § 1668. The limitations provision therefore cannot stand in the way of Claims 2, 5, and 6, as they all aver some form of fraud by Defendant.

---

[2] Plaintiff summarily avers in the FAC that the limitations provision is unconscionable. Dkt. 21 ¶ 113. Plaintiff further states in its Opposition that it "reserves to argue unconscionability as the case progresses." Dkt. 25, at 21 n.6. Since Plaintiff has thus far not meaningfully argued that the limitations provision is, in fact, unconscionable, this Order assumes the provision is enforceable.

For the remaining claims, the limitations provision presents a possible obstacle, because it limits Plaintiff's potential relief. Plaintiff argues it would be more appropriate to defer resolving this question until a later stage in the litigation, given that the distinction between general (or direct) damages and consequential (or indirect) damages is "relative not absolute." While the distinction between these two forms of damages might not be quite as nebulous as Plaintiff suggests, the point is well taken. Given that each of the claims plausibly avers that Shared was harmed as a result of Defendant's conduct, the discovery process would aid in determining more concretely whether each claim avers direct or indirect damages. The limitations provision will therefore not mandate dismissal of any of Plaintiff's claims, though Defendant can always reassert the limitations provision in, for example, a motion for summary judgment.

**C. Sufficient Pleadings**

Finally, every claim must make a minimum showing of plausibility in order to survive a motion to dismiss, and Rule 9(b) further requires claims sounding in fraud to be pleaded with particularity. The surviving portions of Claims 3 and 4 are discussed first; Claim 2 is discussed second; and Claims 5 and 6 are discussed third.

1. Breach of Contract & Implied Covenant Claims: FAN Terms

Plaintiff claims that Defendant breached the FAN Terms by failing to provide Shared with advance notice that its access to Instant Articles would be suspended. Plaintiff further argues that, to the extent the FAN Terms did not necessarily require Defendant to provide advance notice, Facebook's failure to do so would still constitute a breach of the implied covenant of good faith and fair dealing. Defendant, in response, contests Plaintiff's interpretation of the FAN Terms and argues that no breach occurred because (a) it was not required to offer "advance" notice at all and (b) it did, in fact, offer after-the-fact notice.

The main dispute, then, turns largely on the interpretation of the FAN Terms themselves. Contrary to Defendant's contention, the FAN Terms are not self-evidently clear: "notice" is susceptible to both interpretations (i.e., "advance" notice and "after-the-fact" notice). *See, e.g.*, *Notice*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/notice (defining

1  "notice" as both "the announcement of a party's intention to quit an agreement or relation at a
2  specified time" and "the condition of being warned or notified . . ."). Accepting Plaintiff's
3  contentions as true, as the law requires, Plaintiff has adequately pleaded these criteria. Plaintiff has
4  also adequately pleaded proximate causation between the averred breach and the damages that
5  ensued — namely by precluding Shared's ability to pivot to other forms of content creation. The
6  motion is therefore denied as to these portions of Claims 3 and 4.

### 2. Breach of Contract: Advertising Policies

Plaintiff similarly avers, in Claim 3, that Defendant breached the terms of the Advertising Policies by not providing sufficient "details that explain[ed] why" Plaintiff's ads were rejected from Facebook. As with the averred breach of the FAN Terms, Defendant moves to dismiss primarily on the grounds that the clear terms of the Advertising Policies did not require explanations "sufficient for Shared to bring its ads into compliance" and that Defendant did, in fact, provide details — the details being that the ads were suspended for violating the Advertising Policies. This dispute, once more, turns largely on contract interpretation, and again, Plaintiff's interpretation is plausible. Plaintiff has also adequately pleaded proximate causation between the averred breach and damages — namely, that Plaintiff wasted money on ads it would otherwise not have purchased. The motion is therefore denied as to this portion of Claim 3.

### 3. California UCL Claim

Plaintiff avers, in Claim 2, that Defendant violated the UCL, which prohibits "unlawful, unfair or fraudulent business practices." Cal. Bus. & Prof. Code § 17200. Specifically, Plaintiff contends that Defendant's failure to provide "details that explain why" ads were rejected violated both the "fraudulent" and "unfair" prongs of the UCL. "Because the statute is written in the disjunctive, . . . [e]ach prong of the UCL is a separate and distinct theory of liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

#### a. "Fraudulent" Prong

In order to prevail on a UCL claim under the "fraudulent" prong, Plaintiff must satisfy the "reasonable consumer" standard: it must show that "members of the public are likely to be

deceived." *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1011 (N.D. Cal. 2012). Since this claim sounds in fraud, Rule 9(b) requires that the claim be stated with particularity. Here, Plaintiff has met its burden. Shared argues that the Advertising Policies themselves contained a fraudulent statement — i.e., that ad partners would be provided with sufficient details to bring their rejected ads into conformity with Facebook's policies. It is plausible that a reasonable consumer would concur with Shared's interpretation of the Policies, notwithstanding Defendant's contrary interpretation. Indeed, Plaintiff supports this interpretation by offering examples of numerous other ad partners that faced similar frustration in using Facebook's self-serve ads. *See* Dkt. 21, ¶¶ 75–86. It is similarly plausible, at the very least, that Defendant knew or should have known that it could not comply with this expectation due to its averred reliance on artificial intelligence. While Plaintiff does not state who specifically at Shared read the Policies, or on what particular dates they read them, the FAC states that Plaintiff *did* read the Advertising Policies "[p]rior to deciding to advertise and/or continue advertising on Facebook." In combination, this suffices to satisfy Rule 9(b)'s heightened pleading standards. Plaintiff has therefore stated a claim under the "fraudulent" prong of the UCL, and the motion is denied in this respect.

### b. "Unfair" Prong

At present, California courts have "adopt[ed] three different tests for determining unfairness in the consumer context." *Nationwide Biweekly Admin., Inc. v. Super. Ct. of Alameda Cnty.*, 462 P.3d 461, 472 (Cal. 2020). Under the "balancing test," the court must examine the impact of an alleged unfair practice on its victim, "balanced against the reasons, justifications and motives of the alleged wrongdoer." *Id.* at 472 n.10; *see also In re Anthem, Inc. Data Breach Litigation*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016) (balancing test involves considering whether plaintiff "alleg[ed] immoral, unethical, oppressive, unscrupulous, or substantially injurious conduct by Defendant[]"). Some courts apply a different, three-part balancing test, under which "(1) [t]he consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Nationwide*, 462 P.3d at 472 n.10.

Finally, the "tethering test" requires the plaintiff to show that "the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL [is] tethered to specific constitutional, statutory, or regulatory provisions." *In re Adobe Sys., Inc. Privacy Litigation*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014).

Here, Plaintiff argues that Defendant's conduct is unfair because, by failing to provide satisfactory explanations for ad rejections, Defendant "provide[d] advertising services at a lower cost, and . . . made those advertising services appear to be more valuable than they were." Dkt. 21 ¶ 74. Plaintiff suggests this was due to Defendant's "over-reliance on artificial intelligence" in ad regulation, which allowed Facebook to "maximize its profits" rather than provide adequate explanations. *Id.* ¶¶ 71, 74. Plaintiff also argues Defendant's conduct was "contrary to legislatively declared public policies that seek to protect consumers from misleading statements." *Id.* ¶ 72.

Plaintiff has made an adequate showing that Defendant's conduct was "unfair" under the tethering test. While this claim essentially overlaps with Plaintiff's claim under the "fraudulent" prong, Defendant is incorrect in arguing that this would require dismissal: "unfair" prong claims that overlap with claims under another UCL prong need only be dismissed "if the claims under the other . . . prongs of the UCL *do not survive*." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017) (emphasis added); *see also Punian v. Gillette Co.*, 2016 WL 1029607, at *17 (N.D. Cal. Mar. 15, 2016). As noted above, Plaintiff has stated a valid claim under the "fraudulent" prong, so its claim under the "unfair" prong may proceed since it has articulated a specific state policy that Defendant has allegedly violated.[3] The motion to dismiss the UCL claim under the "unfair" prong is therefore denied.

4. Misrepresentation Claims

Finally, Plaintiff avers, in Claims 5 and 6, that Defendant misrepresented to Plaintiff that it would receive both "advance notice" that it would lose access to Instant Articles, and that it would

---

[3] Plaintiff's "unfair" prong claim therefore rises and falls with its "fraudulent" prong claim. This Order expresses no opinion as to whether Plaintiff has adequately pleaded a claim under the "unfair" prong for reasons other than Defendant's allegedly misleading conduct.

ORDER ON MOTION TO DISMISS
CASE NO. 22-cv-02366-RS

11

receive sufficient "details that explain why" its ads were rejected. The latter argument overlaps almost entirely with Claim 2, and these two claims must therefore rise or fall together. Given that Plaintiff satisfactorily stated a claim under the "fraudulent" prong of the UCL, it has also stated a plausible claim for misrepresentation with respect to the Advertising Policies.

As to the FAN Terms and the lack of adequate notice, the reasoning above applies here as well. Although Plaintiff does not state *who* at Shared actually read the FAN Terms, the FAC nevertheless states that Shared "reasonably relied on [the FAN Terms] in connection with its decision" to invest in and utilize Instant Articles. Dkt. 21 ¶ 131. The FAC therefore avers Defendant's wrongful conduct with sufficient particularity to satisfy Rule 9(b), and Defendant's motion is therefore denied with respect to Claims 5 and 6.[4]

## V. CONCLUSION

Based on the foregoing analysis, the motion to dismiss is granted in part and otherwise denied. Claim 1 is dismissed without leave to amend; Claim 3 is dismissed with respect to the Terms of Service, without leave to amend; and Claim 4 is dismissed with respect to the Terms of Service, without leave to amend. The motion is denied in all other respects.

**IT IS SO ORDERED**.

Dated: September 21, 2022

RICHARD SEEBORG
Chief United States District Judge

---

[4] Plaintiff pleads Claim 5 and 6 in the alternative, as it must, because it is impossible to be liable for *intentional* and *negligent* misrepresentation simultaneously for the same conduct. The distinction turns on Defendant's knowledge, but since knowledge may be alleged generally under Rule 9(b), Plaintiff has met this requirement.